STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel H. KUTZ, Defendant-Appellant.†

Court of Appeals

*No. 02–1670–CR. Submitted on briefs May 14, 2003.—
Decided September 25, 2003.*

2003 WI App 205

(Also reported in 671 N.W.2d 660.)

† Petition to review denied 1-23-04.

534

On behalf of the defendant-appellant, the cause was submitted on the briefs of *T. Christopher Kelly, Kelly & Habermehl, S.C.*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Lara M. Herman*, asst. attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Deininger, P.J., Dykman and Vergeront, JJ.

¶ 1. VERGERONT, J. Daniel Kutz was charged with first-degree intentional homicide, hiding a corpse, stalking, and obstructing an officer, all arising out of the disappearance of his wife, Elizabeth Kutz, on July 27, 2000, and events preceding her disappearance. He was convicted of all four offenses after a jury trial and now appeals on two grounds: (1) the State did not have probable cause to arrest him and the trial court therefore erred in denying his motion to suppress evidence obtained in a search incident to that arrest; and (2) a number of Elizabeth's statements, related by witnesses at trial, were inadmissible hearsay.

¶ 2. We conclude the State did have probable cause to arrest Daniel and the trial court therefore properly denied his motion to suppress evidence. With respect to those evidentiary challenges Daniel has properly preserved for appellate review, we conclude: (1) the instruction of Elizabeth to her mother to come looking for her if she was not home by 3:45 p.m. was not hearsay and therefore was not inadmissible on hearsay grounds; (2) Elizabeth's hearsay statements to others that Daniel was following her came within the recent perception exception in Wis. Stat. § 908.045(2) (2001–02)[1] and therefore were properly admitted; and (3) Elizabeth's hearsay statements to others of threats Daniel had made to her did not come within the state-of-mind exception in Wis. Stat. § 908.03(3), the recent perception exception in § 908.045(2), or the

_____

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

excited utterance exception in § 908.03(2)[2] and were therefore erroneously admitted; however, these errors were harmless. Accordingly, we affirm the judgment of conviction for each of the four offenses.

## Probable Cause To Arrest

I. <u>Background</u>

¶ 3. At the time of her disappearance, Daniel and Elizabeth were married, had been together approximately twelve years, and had two children. They were having marital problems; about a week before her disappearance, Elizabeth had moved out of the house she shared with Daniel near Poynette, Wisconsin, and taken the two children to live with her mother in Poynette. On July 27, 2000, Elizabeth went to work in the morning at Demco in DeForest and left at 3:15 p.m., but she did not return to her mother's house. Her family reported her missing later that day, and officers of the Village of DeForest Police Department began to search for her and Daniel and the vehicles each had been driving. The car Daniel had been driving that day, a blue Cavalier, was found about 11:00 p.m. parked behind a closed business down the street from Demco. Also at about 11:00 p.m., officers of the Dane County Sheriff's Department picked up Daniel walking north along Highway CV, just north of the airport, without shoes or a shirt. They dropped Daniel off at his brother's house in DeForest, where DeForest police officers located him. They asked Daniel to come to the police department for further questioning and he did.

---

[2] As will be seen, the State argues that only one of these statements comes within the excited utterance exception in Wis. Stat. § 908.03(2), so we address only that one statement in relation to this exception.

Approximately two hours later, Officer James Pertzborn placed Daniel under arrest. One of the items taken from him in the search incident to the arrest was a wristwatch, which was later tested and revealed traces of Elizabeth's blood. Her body was never located.

¶ 4. Prior to trial, Daniel moved to suppress the evidence of the wristwatch and the test results, contending that the State lacked probable cause to arrest him. The evidence at the hearing on this motion showed that at the time of the arrest, Officer Pertzborn had the following information. Greg Stahl came to the police department shortly after 9:00 p.m. on July 27 and said that he and Elizabeth were having an affair; Elizabeth had told him Daniel was distraught over the breakup of their marriage and had threatened to kill himself; he had seen Daniel earlier that day in a blue Cavalier in an apartment parking lot near Demco; he and a friend had looked for Elizabeth and could not find her; and he and Elizabeth had plans for the evening and it was unlike her to not notify him if her plans changed. Stahl also stated that Elizabeth had told him on several occasions that Daniel had followed her, she was tired of his "controlling nature," and she was afraid.[3] Officer Pertzborn also learned that Elizabeth was living with

---

[3] At the hearing, Officer Pertzborn testified that he could not recall whether Stahl told him the basis for Elizabeth's fear—whether she was afraid to leave the marriage or was afraid of Daniel—and he did not ask Stahl that question. However, while testifying he underlined the statements in a probable cause affidavit he had prepared after the arrest that contained information he had at the time he made the arrest, and the underlined statements include one made by Stahl to Officer McGlynn that "Elizabeth has stated to him [Stahl] that she is afraid of Daniel Kutz due to his controlling nature." Officer Pertzborn also underlined the statement that "Stahl

her mother and her mother had reported that Elizabeth called her at 3:15 p.m. and said she would be home from work in a half hour and if she were not home by then, to come looking for her. Her mother stated that it was uncharacteristic of Elizabeth not to let her mother know her plans, since she (her mother) had the children. Her mother told Officer Pertzborn she and the family had been contacting as many of Elizabeth's close friends as they could think of and no one had any information about where she might be.

¶ 5. From fellow officers, Officer Pertzborn learned there had been a dispatch report earlier of an "estranged husband possibly stalking or hanging around" his wife's workplace, but the investigating officer did not see the husband. Officer Pertzborn also learned that within the last five months or so Daniel had been in possession of a firearm, which he had shown to family members, and had been arrested approximately two years previously for discharging a shotgun at or toward a truck driver who came to Daniel's residence to repossess a truck.

¶ 6. Officer Pertzborn was one of the officers who went to Daniel's brother's house. He saw that Daniel was not wearing a shirt or shoes, his socks were wet and dirty, and his pants were rolled up and appeared damp or wet at the bottom. Daniel appeared very physically tired and depressed. Officer Pertzborn learned from another officer that when Daniel had arrived at his brother's house, his brother had asked him where his boots and shirt were and where Elizabeth was, and Daniel had not given an answer; his brother was very concerned about where Elizabeth was.

---

advised Officer McGlynn that Elizabeth had told him that on several occasions Daniel Kutz had followed her to work."

¶ 7. Daniel disclosed that he was extremely distraught over the breakup of his marriage; he said that was the only thing on his mind, and he had not eaten or slept for two days. He suspected that Elizabeth was having an affair with a man named Greg who lived in Portage. He also spoke of a foreclosure that was occurring on farmland he and Elizabeth owned. Officer Pertzborn observed small scratches on Daniel's wrist and a small sore on his hand, and he identified photographs showing these, which were admitted into evidence. He also saw what appeared to be dried blood on one of the sores.

¶ 8. Daniel gave this account of his activities on July 27. He had called Elizabeth early in the morning to say he would probably stop by to see her at work that day. He drove the blue Cavalier to meet her after work, and he parked it on County Highway V to wait for her. About 3:30 p.m., he saw her coming towards him in the green Jeep, she pulled over, he got in the Jeep with her, and left his car there. They drove around and talked about their marriage and the children; he said he could not be specific about where they went because he was concentrating on their conversation. They eventually went to Token Creek Park and had sexual intercourse in the vehicle, and he took his boots off, but kept his shirt on. They talked more, left the park, and Elizabeth drove to a Stop-N-Go gas station where he got out and went into the store; she said she had to go to Portage and he said he would walk. After he went into the store, he realized he left his boots in the Jeep. He bought a drink and snack, ate them, and started walking north on Highway CV until the officers picked him up. His intention was to walk home, which was about twenty-five to thirty miles away. He acknowledged that it was out of character for Elizabeth not to contact anyone and

543

let them know where she was. However, he expressed no concern for her welfare or whereabouts and declined the offer to go with them to try to find her.

¶ 9. Officer Pertzborn testified to the training he had had on domestic violence, and, based on that training and on his experience, he saw several "red flags" indicating that Daniel may have harmed Elizabeth when he was with her on July 27: the evidence that Daniel had been seen at her workplace earlier in the day, meaning that he was potentially stalking her; her statement to her mother to come looking for her if she was not home by a certain time, potentially indicating she knew Daniel was stalking her and was afraid of him; her moving out and Daniel's knowledge that she wanted to end the marriage and was having an affair; and the intensity of his preoccupation with the breakup of the marriage. Officer Pertzborn was also aware that Daniel's car had been found in a location that was not where he said he left it.

¶ 10. Based on this evidence, the trial court concluded that when Officer Pertzborn arrested Daniel, he had probable cause to believe Daniel had committed a criminal offense. The court further concluded that the search was a lawful search incident to a lawful arrest, and there was probable cause to believe that the wristwatch might contain "trace elements" based on the evidence of his contact with Elizabeth. The court therefore denied the motion to suppress the evidence.

II. Discussion

¶ 11. In order to be lawful, an arrest must be based on probable cause. *State v. Secrist*, 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999). Probable cause for

arrest exists when the totality of the circumstances within the arresting officer's knowledge would lead a reasonable police officer to believe that the defendant probably committed a crime. *State v. Koch*, 175 Wis. 2d 684, 701, 499 N.W.2d 152 (1993). While the information must be sufficient to lead a reasonable officer to believe that the defendant's involvement in a crime is "more than a possibility," it "need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." *Secrist*, 224 Wis. 2d at 212. Probable cause is a flexible, commonsense measure of the plausibility of particular conclusions about human behavior. *State v. Petrone*, 161 Wis. 2d 530, 547–48, 468 N.W.2d 676 (1991).

¶ 12. In determining whether probable cause exists, the court applies an objective standard, *see State v. Riddle*, 192 Wis. 2d 470, 476, 531 N.W.2d 408 (Ct. App. 1995), and is not bound by the officer's subjective assessment or motivation. *State v. Kasian*, 207 Wis. 2d 611, 621, 558 N.W.2d 687 (Ct. App. 1996). The court is to consider the information available to the officer from the standpoint of one versed in law enforcement, taking the officer's training and experience into account. *State v. Pozo*, 198 Wis. 2d 705, 712–13, 544 N.W.2d 228 (Ct. App. 1995). The officer's belief may be predicated in part upon hearsay information, and the officer may rely on the collective knowledge of the officer's entire department. *State v. Cheers*, 102 Wis. 2d 367, 386, 388–89, 306 N.W.2d 676 (1981). When a police officer is confronted with two reasonable competing inferences, one justifying arrest and the other not, the officer is entitled to rely on the reasonable inference justifying arrest. *State ex rel. McCaffrey v. Shanks*, 124 Wis. 2d 216, 236, 369 N.W.2d 743 (Ct. App. 1985).

¶ 13. In reviewing an order granting or denying a motion to suppress evidence, we uphold the trial court's findings of fact unless they are clearly erroneous. *Secrist*, 224 Wis. 2d at 207. In this case, there were no significant disputes in the evidence presented at the motion hearing. Whether the evidence satisfies the standard of probable cause is a question of law, which we review de novo. *Id.* at 208. Our independent review leads us to agree with the trial court that Officer Pertzborn did have probable cause to arrest Daniel.

¶ 14. Based on the information Officer Pertzborn had at the time he arrested Daniel, a reasonable officer could infer that the reason Elizabeth had not returned to her mother's house by 3:45 p.m. on July 27 was that she had been seriously harmed. The officer knew from Stahl, Elizabeth's mother, and Daniel himself that it was unlike Elizabeth not to let others know if her plans changed; she had told her mother she would be home within a half hour after work and she had plans with Stahl for the evening. The officer also knew that her family and friends had been searching for her since about 3:45 p.m. without success. It was therefore reasonable to infer that someone would have learned of her whereabouts if she had not been incapacitated and also hidden. Had she been in an accident, which Daniel suggests is a reasonable alternative explanation, that likely would have come to the attention of someone searching for her.

¶ 15. From the following evidence, a reasonable officer could infer that Daniel was probably the person who had harmed Elizabeth and put her somewhere she would not be found. He was the last person known to have seen her. His story—that she dropped him off at the Stop-N-Go, said she had to go to Portage, and he

546

decided to walk home twenty-five to thirty miles, forgetting he had no shoes on—is not credible for at least three reasons: (1) Daniel suspected she was having an affair with a man who lived in Portage and was upset about it, so it is not believable that he would have had no response to her statement that she had to go to Portage; (2) it is not believable that he would have been agreeable to being left at the Stop-N-Go with the only option being to walk such a distance; and (3) it is not believable that, planning to walk that distance, he would not have made sure he had his shoes before Elizabeth left in the Jeep. From the implausibility of this story and Daniel's lie about the location of his car, it is reasonable to infer that he had something to hide about his encounter with Elizabeth. From his indifference to what had happened to her, it is reasonable to infer that he knew what had happened to her. Had he not known, it is inconceivable, given the strong feelings he had expressed for her, that he would not have been very upset that she had not turned up and would not have been anxious to find her, especially because, according to him, she said she was going to Portage where he knew the man lived.

¶ 16. Officer Pertzborn knew that Daniel was distraught over Elizabeth's decision to leave him and his suspicions of her affair to the point of being obsessed. From this information and the information that Daniel had followed her to work on several occasions and parked his car near her workplace during the workday, the officer could reasonably infer that Daniel was monitoring her whereabouts. He could reasonably infer from the foregoing information and from the phone call to her mother that Daniel had given Elizabeth some reason to be afraid that he would be waiting for her after work and would not let her go home as she

planned. The scratches on Daniel's wrist and sore on his hand were consistent with a recent struggle with another person. Officer Pertzborn knew that Daniel had possessed a firearm as recently as five months ago, so he could reasonably infer Daniel had access to a weapon, and from the information about the arrest two years earlier, he could reasonably infer, at a minimum, that Daniel was capable of using a firearm to threaten harm to another person. Finally, from Officer Pertzborn's training on domestic abuse, he knew that Daniel's behavior and emotions in response to his wife's leaving were indicators of a significant potential for engaging in violence toward her.

¶ 17. Daniel argues that, because there was no physical evidence of foul play, a disappearance of twelve hours is sufficient only for reasonable suspicion that Elizabeth was the victim of a crime, not for probable cause to believe that Daniel had committed a crime against her. Daniel also argues that his distress over his wife's affair and her decision to leave are not sufficient to reasonably suggest that he would commit violence against her, because most of the time people do not commit violence against their spouses for those reasons. However, we are to consider the totality of the circumstances, not each fact in isolation. The circumstances here include specific behaviors and reactions of Daniel as well as other evidence, that, to an officer with Officer Pertzborn's training, reasonably suggest that this particular situation had probably escalated to violence against Elizabeth. As for Daniel's point that the scratches on Daniel's wrists were consistent with the fact that he was sitting in tall grass when the officers picked him up, Officer Pertzborn was not required to draw the inference consistent with innocence when

there was a reasonable inference consistent with culpability. *See Shanks*, 124 Wis. 2d at 236.[4]

¶ 18. We are satisfied that, at the time Officer Pertzborn arrested Daniel, the totality of the circumstances known to the officer, together with reasonable inferences from that information, was such that a reasonable officer could conclude that Daniel had probably committed a crime of violence against his wife.

## Evidentiary Rulings

### I. Background

¶ 19. Daniel brought a pretrial motion in limine seeking to preclude witnesses from relating numerous things Elizabeth said to them on the ground that they were hearsay statements and did not come within any exception. His objections were taken up by the court in these categories: (1) Elizabeth's utterance to her mother when she called her on July 27 from work about 3:15 p.m., "If I am not home in a half hour come looking

---

[4] Daniel objects to consideration of his prior arrest as improper, citing *State v. Betow*, 226 Wis. 2d 90, 95 n.2, 593 N.W.2d 499 (Ct. App. 1999). The footnote he cites states that an individual's prior criminal record, in and of itself, is not sufficient to provide a basis for reasonable suspicion to detain an individual. Daniel argues that if a prior criminal record is not sufficient for reasonable suspicion to detain an individual, it is not sufficient for probable cause to arrest. This argument has no application here, because the State has never contended that Daniel's prior arrest alone establishes probable cause. Nothing in *Betow* suggests that a prior arrest may not be considered as part of the totality of circumstances a reasonable officer takes into account in deciding whether there is probable cause to arrest.

for me";[5] (2) Elizabeth's statements that Daniel had made threats to her; (3) Elizabeth's statements that Daniel was following her; and (4) Elizabeth's statements that Daniel had locked her in the bathroom.

¶ 20. With respect to Elizabeth's utterance to her mother "[i]f I am not home in a half hour come looking for me," the prosecutor argued that it was not hearsay because it was a command or instruction and not an assertion of historical fact, and therefore could not be offered to prove the truth of its contents. The prosecutor also stated: "The fact that an inference—a very strong inference—and obviously there is no objection to it on the grounds of relevance because it is highly relevant—the fact that an inference can be drawn from the command doesn't make it hearsay . . . ." Defense counsel replied that the prosecutor's comments showed that the State intended to use the utterance to prove that Elizabeth did run into trouble and thus it was hearsay. The court asked the prosecutor the purpose for the State offering the utterances. The prosecutor responded that the purpose was to prove that "after a half hour people started looking for Beth and didn't find her." The prosecutor continued:

> I think it would be admissible and is admissible as a statement by Beth indicating some concern on her part

[5] We use "utterance," admittedly an awkward term, rather than "statement" because, as we discuss later in this opinion, there is a dispute whether this is a "statement" as defined in Wis. Stat. § 908.01(1).

Elizabeth's mother actually testified at trial that Elizabeth called her just before 3:00 p.m. and "said she would be working until 3:15, would be home half an hour after that, and if she wasn't home, to come looking for her." The difference between this and the version that was the subject of the motion in limine is not significant.

for her health and well-being, that may be true, but we never have to get to that question because it's not hearsay in the first place, it doesn't assert a fact like the question, "Joe, why did you stab Bill?" asserts a fact.

¶ 21. The court concluded that because the State said it was not offering Elizabeth's utterance to her mother for the truth of its contents but for other reasons, it was admissible, and the "parties can argue the inferences that can be drawn therefrom."

¶ 22. With respect to Elizabeth's statements that Daniel made threats to her, the prosecutor argued that they came within the state-of-mind exception in WIS. STAT. § 908.03(3) and the recent perception exception in WIS. STAT. § 908.045(2). Defense counsel conceded that some of these statements might be admissible as a recent perception with the proper foundation establishing the relation in time between Elizabeth's statement and the event she described, but, counsel asserted, the submissions did not establish that foundation. The court agreed with defense counsel that it could not tell from the submissions when the threats that Elizabeth was relating had been made, and therefore it could not tell whether her statements came within the hearsay exception for recent perceptions. However, the court also stated that, based on the case law it had reviewed, it viewed Elizabeth's statements of threats by Daniel to be admissible under the state-of-mind exception, § 908.03(3).

¶ 23. With respect to Elizabeth's statements that Daniel was following her, the State argued, based on the submissions and certain offers of proof, that there was adequate foundation for all the statements under either one or more of the exceptions for present sense impression, WIS. STAT. § 908.03(1), excited utterance, WIS. STAT. § 908.03(2), and recent perception, WIS. STAT.

§ 908.045(2). After rather extensive commentary on the statements and the various exceptions argued by the prosecutor, the court concluded its comments with:

> I'm not sure as I read these that they would be excited utterances, although some of them could be with the proper foundation, but I think that they do fall into one, two or three—Subsection (1), (2) or (3) of 908.03, and I think that they do fall within the category of 908.045(2).
>
> Keep in mind by indicating that I'm going to admit these statements, the defense is certainly not estopped from renewing their objection if you feel during the course of the trial that the prerequisite underpinnings for this testimony have not been made by the State.
>
> But based on what I've been able to read here at this time I would admit those statements, as well.

¶ 24. Finally, the court considered Elizabeth's statements to others that Daniel had locked her in the bathroom and she had to climb out the window.[6] There was a brief discussion on the various exceptions that might apply, concluding with the court's statement that it could not determine which, if any, exceptions applied without knowing how the evidence was actually going to come in at trial.

¶ 25. At trial, Daniel's counsel did not object on hearsay grounds to any of the testimony relating Elizabeth's utterance and statements.

---

[6] This incident had been the subject of a motion in limine on the ground that the incident was evidence of a prior act by Daniel and inadmissible under WIS. STAT. § 904.04(2). The court ruled the incident satisfied that statute's criteria for admissibility and the State therefore could present evidence of the incident at trial, assuming the State could establish the incident with admissible evidence.

II. Discussion

A. Waiver

¶ 26. We address first the State's contention that Daniel has preserved his objection only to Elizabeth's utterance to her mother to come looking for her and has waived the right to challenge all the other statements of Elizabeth that were the subject of his hearsay motion in limine. According to the State, the court made a definitive ruling only on that one utterance, and on all the other statements it simply provided guidance as to what it would likely consider admissible at trial. Therefore, the State continues, Daniel had to renew his objections at trial in order to preserve them, which he did not do.

¶ 27. The general rule is that parties waive objections to the admissibility of evidence if they do not object before the trial court. *State v. Edwards*, 2002 WI App 66, ¶ 9, 251 Wis. 2d 651, 642 N.W.2d 537. Whether an objection adequately preserves an issue for appeal presents a question of law, which the appellate court reviews de novo. *State v. Agnello*, 226 Wis. 2d 164, 172, 593 N.W.2d 427 (1999). The purpose of requiring an adequate objection to preserve an issue for appeal is to give the parties and the court notice of the disputed issue, as well as a fair opportunity to prepare and address it in a way that most efficiently uses judicial resources. *Id.* at 172–73. A definitive pretrial ruling preserves an objection to the admissibility of evidence without the need for an objection at trial, as long as the facts and law presented to the court in the pretrial motion are the same as those that arise at trial. *State v. Venema*, 2002 WI App 202, ¶ 25 n.6, 257 Wis. 2d 491, 650 N.W.2d 898; *State v. Bergeron*, 162 Wis. 2d 521, 528–29, 470 N.W.2d 322 (Ct. App. 1991).

¶ 28. Considering first Elizabeth's statements that Daniel made threats to her, we conclude the court did make a definitive ruling that these were admissible under the state-of-mind exception to the hearsay rule. The fact that the court indicated it could not determine from the record whether those statements came within other exceptions does not render the court's ruling on the state-of-mind exception preliminary or tentative: only one exception is necessary for hearsay to be admissible. For the same reason, after the court made the ruling on the state-of-mind exception, defense counsel was not obligated to object to the same statements at trial on the ground that they did not come within other exceptions.

¶ 29. With respect to Elizabeth's statements that Daniel was following her, we understand the court to have ruled that if the State presented the foundation at trial it had laid out in argument, the statements would be admissible under the exception for recent perception. This is a conditional ruling but nonetheless definitive: the statements come in under that exception as long as the State presents the evidence it said it would. There was therefore no need for defense counsel to renew its hearsay objection to those statements in order to preserve it for appeal unless the State did not present the evidence it said it would, or unless other evidence, not brought to the court's attention at the motion hearing, was presented at trial and called into question the applicability of that exception.[7] As we have already

---

[7] In this case, the evidence the State presented at trial to establish that these statements came within hearsay exceptions, including Wis. Stat. § 908.045(2), was at least as exten-

stated, the fact that the court did not definitively rule on other possible exceptions did not require Daniel to raise the inapplicability of those exceptions at trial.

¶ 30. We do agree with the State, however, that Daniel did not preserve his objection on hearsay grounds to testimony of statements Elizabeth made to others on the bathroom incident. The court made very clear it could not rule on what exceptions might apply to those statements until it heard how the evidence came in at trial. It was therefore incumbent on Daniel to object at trial to any testimony on this incident that he considered inadmissible hearsay. We also agree with the State that Daniel has not preserved for appeal hearsay objections to statements he did not include in his pretrial hearsay motion and did not object to at trial.[8]

---

sive, and often more so, as that outlined at the motion hearing.

[8] We understand that it is often not possible for a trial court to give a definitive ruling on an evidentiary issue pretrial because the court does not know exactly what the evidence is going to be at trial. In such situations, the trial court's comments on how it is likely to rule under a particular scenario are helpful to the parties, and we appreciate the trial court's efforts to do that in this case. The difficulty for an appellate court on review is distinguishing between a pretrial ruling that is sufficiently definite so that the moving party should not be expected to make the same objection at trial to preserve the issue for appeal, and statements by the court that are sufficiently tentative or preliminary so that the moving party should be expected to understand that it is necessary to make the same objection at trial to preserve the objection. The best approach for the moving party—from the standpoint of preserving issues for appeal—is both to clarify with the court the nature of the pretrial ruling and to make the same objection at trial if there is any doubt.

¶ 31. Daniel argues that, because the waiver rule is one of judicial administration rather than judicial authority, we have the authority to, and should, address all the statements he challenges on appeal, even if he did not include them in his pretrial hearsay motion or did not obtain a trial court ruling on them. He relies on *State v. Polashek*, 2001 WI App 130, ¶ 28, 246 Wis. 2d 627, 630 N.W.2d 545 (Ct. App. 2001), *aff'd in part and rev'd in part on other grounds*, 2002 WI 74, 253 Wis. 2d 527, 646 N.W.2d 330 (2002). However, as we explain in *Polashek*, we exercise our discretion to address an issue not raised in the trial court only when the issue is one of law and certain other factors are present. *Id.* In contrast, the admissibility of evidence involves a trial court's discretion, and an objection serves the purpose of allowing the trial court and the other party to correct any evidentiary error during the trial. *See State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679 (Ct. App. 1985). We therefore decline to consider Daniel's hearsay challenges to statements that he did not include in the pretrial motion and to statements on which he did not obtain a definitive ruling.

B. Hearsay

¶ 32. We will address those hearsay objections Daniel properly preserved in this order: (1) Elizabeth's utterance to her mother "[i]f I am not home in a half hour come looking for me"; (2) her statements that Daniel was following her; and (3) her statements that Daniel made threats to her.

¶ 33. The decision to admit or exclude evidence is generally a matter within the trial court's discretion. *State v. Peters*, 166 Wis. 2d 168, 175, 479 N.W.2d 198 (Ct.

App. 1991). We do not reverse such rulings if the court properly exercises its discretion by applying the correct legal standard to the relevant facts of record. *State v. Sveum*, 220 Wis. 2d 396, 405, 584 N.W.2d 137 (Ct. App. 1998). When the trial court bases a discretionary decision on an erroneous view of the law, it has exceeded its discretion. *Id.* However, an appellate court may review the record to determine if a statement is admissible under a particular hearsay exception even though the trial court did not admit the statement on that basis. *See State v. Martinez*, 150 Wis. 2d 62, 72, 440 N.W.2d 783 (1989).

### 1. "If I am not home in a half hour come looking for me"

¶ 34. Daniel contends that Elizabeth's utterance to her mother, although in the form of an instruction to come looking for her, contained an implicit assertion that Daniel posed a danger to her. Therefore, he continues, it was a "statement" as defined in Wis. Stat. § 908.01(1): "(a) an oral or written assertion or (b) nonverbal conduct of a person, if it is intended by the person as an assertion." He argues that in spite of the prosecutor's statement to the trial court, the State offered Elizabeth's instruction to prove that Daniel did in fact pose a danger to her, and it was therefore hearsay, that is, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Section 908.01(3).

¶ 35. The State responds that an instruction is not hearsay because it is not an "assertion" under Wis. Stat. § 908.01(1). It emphasizes that Elizabeth's mother's testimony was not offered to prove the truth of any assertion contained in the instruction, but rather to

show why her mother went looking for her when she did. In the alternative, the State argues, even if the instruction did contain an implicit assertion, implicit assertions are not included in the definition of "statement" and therefore cannot be hearsay.

¶ 36. There is no dispute that an out-of-court instruction to do something is not hearsay when offered to prove that the instruction was given and, accordingly, to explain the effect on the person to whom the instruction was given. *See State v. Curbello-Rodriguez*, 119 Wis. 2d 414, 427, 351 N.W.2d 758 (Ct. App. 1984) (statement not hearsay when offered to prove that it was said, that victims heard it, and victims were intimidated as a result); *see also State v. Wilson*, 160 Wis. 2d 774, 779, 467 N.W.2d 130 (Ct. App. 1991) (statement that owner's roommate told defendant in a burglary prosecution that he could enter and take some items not hearsay to prove that the effect on the defendant, that is, he believed he had permission). Therefore, the trial court correctly ruled that the instruction was not hearsay when used to show why her mother began looking for her at 3:45 p.m.[9] However, we do agree with Daniel that the State sought to offer and did offer Elizabeth's mother's testimony for purposes in addition

[9] On appeal Daniel contends that evidence of Elizabeth's instruction for this purpose was unnecessary because there was other evidence to show why and when her mother and other family members went looking for her. However, Daniel's counsel did not object in the trial court to this testimony on the grounds of cumulativeness; nor did he object based on prejudice. *See* Wis. Stat. § 904.03. Accordingly, he has waived the right to have us consider those grounds on appeal, and we do not address them. We also observe that Daniel did not object in the trial court that evidence of Elizabeth's instruction for this purpose was not relevant.

to establishing why she went looking for her daughter when she did. Although that is the only purpose the prosecutor expressly acknowledged when asked by the trial court, the prosecutor's other comments suggest the State viewed Elizabeth's instruction to her mother as also relevant—"highly relevant"—to Elizabeth's concern for her own safety. We understand the State's position to be that, because Elizabeth's utterance was in the form of an instruction, it was not hearsay when used either to prove that she said it (and thus to prove what her mother did in response) or to prove Elizabeth's view's of Daniel, and the State could therefore use the instruction for both purposes. The court's ruling appears to accept this position, because it allowed the parties to "argue the inferences that can be drawn therefrom."

¶ 37. Our examination of the record at trial shows the State did in fact use Elizabeth's instruction for a purpose other than to explain why her mother went looking for her when she did. Her instruction to her mother was mentioned three times in the State's closing argument, and one of those references was clearly used to convey that Elizabeth feared Daniel might do something to harm her and that he did.[10] We therefore address Daniel's contention that Elizabeth's instruction to her mother was hearsay when used in this way.

---

[10] The prosecutor listed a series of events that occurred on July 27 and pointed to Daniel's guilt in Elizabeth's murder, beginning each sentence with, "[i]t [July 27, 2000] just happens to be the day that . . . ." In the midst of this series of statements, the prosecutor said: "and it just happens to be the day that Beth calls her mother and says, I'm leaving at 3:15 and if I am not home in half an hour come looking for me. What a coincidence."

559

¶ 38. We begin with the question of whether Elizabeth's instruction to her mother was an "assertion" within the meaning of Wis. Stat. § 908.01(1) and (3). "Assertion" is not defined in the rule, and neither party nor our own research has disclosed a Wisconsin case that has defined this word. Federal cases applying the identical federal rule, Fed. R. Evid. 801(a), have defined assertions as "positive declaration[s]," *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990), and "utterances [that] assert facts." *United States v. Gibson*, 675 F.2d 825, 834 (6th Cir. 1982). Treatises use definitions such as "expression of fact, or opinion, or . . . both," David F. Binder, Hearsay Handbook § 1–2, at 1–3 (4th ed. 2001); and "either true or false and typically [but not necessarily] describ[ing] an event or condition that occurred in the past," also including, for example, "a present state of mind, emotion or feeling." 7 Daniel D. Blinka, Wisconsin Practice: Wisconsin Evidence § 801.2, at 525 (2d ed. 2001). These definitions are generally consistent with the dictionary definition of "assert": to "state or express positively; affirm." The American Heritage College Dictionary 82 (3d ed. 1993).[11] Bringing these various sources together and condensing a bit, we conclude that an "assertion" as used in Wis. Stat. § 908.01(1) means an expression of a fact, condition, or opinion.

¶ 39. The Wisconsin Judicial Council Committee's Note to Wis. Stat. § 908.01 adds a further qualification to the term "assertion" in that it considers the intention of the speaker[12] to be determinative of whether some-

---

[11] *See also* Black's Law Dictionary 111 (7th ed. 1999): "A declaration or allegation."

[12] We use the term "speaker" here rather than "declarant" because using "declarant" implies that the utterance is a state-

thing is an "assertion." 59 Wis. 2d R229, R230 (1973). While this discussion primarily occurs in the context of a discussion of nonverbal conduct, which § 908.01(1) explicitly requires must be intended as an assertion in order to be a statement, the note also states: "In the case of an oral or written statement that lends itself to differing views with respect to the nature of the assertion, or nonverbal conduct, the intention of the declarant is the key to whether the statement can become hearsay." *Id.* at R232.[13] The Federal Advisory

ment, (since declarant is defined in WIS. STAT. § 908.01(2) as "a person who makes a statement") but that is the very issue we have yet to resolve. In using "speaker," we recognize that a writing may also be a statement. *See* § 908.01(1).

[13] **Judicial Council Committee's Note**

Sub. (1). ...

. . . .

Attention is called to the definition which places the burden upon the objector to establish the intended assertion of nonverbal conduct if he is to prevail upon his objection.

The nonverbal conduct will be the basis of ascertaining the intention but if the evidence to ascertain intention is to be more extensive, the burden is upon the objector to adduce it. The decision thereon is made by the judge as a finding of preliminary fact pursuant to s. 901.04.

It is the intention of the "declarant" [as defined in subsection (2)]—not the intention of the proponent in offering the evidence —that controls the question of whether the "statement" (as defined in this subsection) is intended as an assertion. The intention of the declarant as a means of distinction between circumstantial evidence and hearsay should not be confused with the purpose of the proponent to prove the truth of the matter asserted referred to in sub. (3), which also is determinative of admissibility.

Sub. (3). When the purpose of the proponent in offering the statement is to prove the truth of the matter asserted, a "statement" other than one made by the declarant while testifying at

561

Committee's Note on the rule also emphasizes the intent of the speaker in determining whether something is an assertion: "nothing is an assertion unless

> trial is hearsay. *In the case of an oral or written statement that lends itself to the differing views with respect to the nature of the assertion, or nonverbal conduct, the intention of the declarant is the key to whether the statement can become hearsay.*

Judicial Council Committee's Note, 1973, Wis. Stat. § 908.01, 59 Wis. 2d R229–32 (emphasis added) (citations omitted).

[14] **Federal Advisory Committee's Note**

Sub. (a). The definition of "statement" assumes importance because the term is used in the definition of hearsay in sub. (c). The effect of the definition of "statement" is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. *The key to the definition is that nothing is an assertion unless intended to be one.*

It can scarcely be doubted that an assertion made in words is intended by the declarant to be an assertion. Hence verbal assertions readily fall into the category of "statement." Whether nonverbal conduct should be regarded as a statement for purposes of defining hearsay requires further consideration. Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement. Other nonverbal conduct, however, may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred. This sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept. Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds. No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct.

intended to be one."[14] Federal Advisory Committee's Note, 1973, WIS. STAT. § 908.01, 59 Wis. 2d R230, R230–32.

¶ 40. The reason for requiring that an utterance be intended as an assertion is that when a speaker does not intend to communicate anything, his or her sincerity is not in question and the need for cross-examination to test perception, memory, and narration is much diminished. *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990). Although some courts and commentators have criticized this reasoning,[15] we consider it generally sound. Moreover, while we are not

The situation giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence. Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of sub. (c) [WIS. STAT. § 908.01(3)].

When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended. The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility. The determination involves no greater difficulty than many other preliminary questions of fact.

Federal Advisory Committee's Note, 1973, WIS. STAT. § 908.01, 59 Wis. 2d R230, R320–32 (emphasis added) (citations omitted).

[15] *See, e.g.,* David E. Seidelson, *Implied Assertions and Federal Rule of Evidence 801: A Continuing Quandary for Federal Courts,* 16 MISS. C. L. REV. 33, 34 (1995); *see also United States v. Pacelli,* 491 F.2d 1108, 1116–17 (2d Cir. 1974).

bound by the Judicial Council Committee's Note,[16] we view it as significant authority in construing the rule. Accordingly, we conclude that an assertion must be intended by the speaker as an expression of a fact, opinion, or condition.

¶ 41. The State contends that Elizabeth's utterance to her mother cannot be considered an assertion because it is an instruction. It is generally true that commands, instructions, and questions are not considered assertions under the federal rule because they are not expressions of a fact, opinion, or condition, but instead are telling someone to do something or asking someone for information. However, this principle is not as rigid as the State suggests. While some treatises may state that commands, instructions, and questions are not assertions, including BINDER, *supra,* § 2.2, at 2–4 to 2–6, on which the State relies, the very cases cited in support of that statement suggest this is not always true. *See, e.g., Lewis,* 902 F.2d at 1179 ("The questions asked by the unknown caller, like *most* questions and inquiries, are not hearsay because they *do not and were not* intended to assert anything.") (emphasis added). Other treatises, including BLINKA, *supra,* § 801.2, at 527–28, on which the State also relies, acknowledge that an exclamation mark or a question mark rather than by a period does not necessarily mean the utterance is not an "assertion" for hearsay purposes. *See also* 2 McCORMICK ON EVIDENCE § 246, at 97 n.6 (John W. Strong, ed., 5th ed. 1999). Indeed, in the trial court the

---

[16] In promulgating the rules of evidence, the Wisconsin Supreme Court stated that it was not adopting either the commentary of the Federal Advisory Committee or the Wisconsin Judicial Council Committee, but was printing them along with the rules for informational purposes. 59 Wis. 2d at R2 (1973).

State conceded that some utterances not in the form of a declarative sentence may contain an assertion, citing the classic example "Joe, why did you stab Bill?" used in *Powell v. State*, 714 N.E.2d 624, 628 (Ind. 1999).[17] Of the federal cases the State cites, some contain general statements to the effect that commands or instructions are not assertions, but in all the cases the commands or instructions were offered to prove that they occurred; thus, in none was the court asked to decide whether a particular command or instruction contained an assertion when offered to prove the truth of that assertion.[18]

¶ 42. We can see no logical reason why the grammatical form of an utterance—whether a declarative sentence, command/instruction or question—should conclusively determine whether an utterance is intended by the speaker as an assertion within the meaning of Wis. Stat. § 908.01(1).[19] We therefore conclude that the fact that Elizabeth's utterance to her

---

[17] The utterance actually at issue in *Powell* was "[W]hat, you think we ain't got guns, too . . . .," which the court held asserted that the men in the group with the speaker were carrying guns. *Powell v. State*, 714 N.E.2d 624, 626–29 (Ind. 1999).

[18] These cases cited by the State are: *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999); *State v. Bellomo*, 176 F.3d 580, 586–87 (2d Cir. 1999); *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994); *United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985); *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984); *United States v. Gibson*, 675 F.2d 825, 833–34 (6th Cir. 1982); *Butler v. United States*, 481 A.2d 431, 438 n.10 (D.C. 1984).

[19] In *Christensen v. Economy Fire & Casualty Co.*, 77 Wis. 2d 50, 54, 252 N.W.2d 81 (1977), the supreme court appears to recognize that the grammatical form of an utterance does not control. The issue in that case was whether the trial court

565

mother was in the form of an instruction does not automatically mean it was not an assertion.

¶ 43. We next consider the State's contention that, because any assertion contained in Elizabeth's instruction is implicit rather than explicit, it is not an assertion within the meaning of WIS. STAT. § 908.01(1). No Wisconsin case has addressed this issue,[20] and the

---

properly excluded the testimony of a witness to an accident who would have testified that one of the victims, who died shortly thereafter,

> asked [the witness], "Why did this happen to me, what could I do, the guy was coming at me." . . . [H]e continued to wonder out loud why the accident had happened to him and what else he could have done to avoid it since the other guy was coming at him." *Id.*

The supreme court referred to the witness's testimony as "admittedly hearsay insofar as it relates to [the victim's] statements" and went on to decide that the trial court had erred in not admitting those statements under the exception for excited utterance, WIS. STAT. § 908.02(2). We observe that the punctuation at the end of the quoted utterance is a period, although the court uses the word "asked" before the utterance. This seems inconsistent but serves to highlight the aspects of both question and assertion contained in the utterance. Moreover, the differences in phrasing between the utterance quoted and the court's continued narration of what the victim said prompts the question: for hearsay purposes does it matter whether the victim said: (1) "What could I do to avoid the accident with the other guy coming at me? [question]"or (2) "What could I do? [question] The other guy was coming at me. [declaratory sentence]" We think not. In this case, whether Elizabeth's utterance is hearsay should not turn on whether she said, "Come looking for me," rather than, "I want you to come looking for me . . . ."

[20] The State cites to the statement in BLINKA that, while no Wisconsin cases have directly discussed the issue of implicit assertions, "extant authority favors the view that implicit

Judicial Council Committee's Note provides no guidance. Our review of federal case law reveals several different approaches.[21]

assertions do not constitute hearsay." WISCONSIN PRACTICE: WISCONSIN EVIDENCE § 801.3, at 535 (2d ed. 2001). The State does not discuss the two Wisconsin cases cited to support this statement, *State v. Wilson*, 160 Wis. 2d 774, 777, 67 N.W.2d 130 (Ct. App. 1991), and *Caccitolo v. State*, 69 Wis. 2d 102, 111, 230 N.W.2d 139 (1975). However, we conclude that neither suggests that implicit assertions may not constitute hearsay.

In *Wilson*, this court decided that the trial court erred in excluding the testimony of a defendant in a burglary prosecution that the owner's roommate gave him permission to enter and remove certain items. 160 Wis. 2d at 777. We concluded the roommate's statements were not hearsay because they were not offered for their truth, but to show their effect on the defendant's state of mind, that is, that he believed he had consent. *Id.* We rejected the State's argument that the statements were hearsay even if not offered to prove the matter expressly asserted because they contained implicit assertions that qualified as hearsay. *Id.* at 778. We concluded that the line of federal cases, exemplified by *State v. Reynolds*, 715 F.2d 99, 103 (3d Cir. 1983), on which the State relied, were not applicable. *Wilson*, 160 Wis. 2d at 779. In those cases, we pointed out, the probative value of the statements depended on the "assumed fact—conspiracy—which they implied," whereas in *Wilson*, the probative value of the statement, and the purpose for which it was offered, was to show that the statement was made, and, thus, to explain why the defendant believed he had consent. *Id.* Our discussion of the *Reynolds* line of cases does not suggest that, if the roommate's statement had contained an implicit assertion and was offered for the truth of that implicit assertion, we would not have considered it hearsay; we did not address that issue because it was not presented by the facts before us. Nor was that issue raised or addressed in *Caccitolo*.

[21] The State relies on BLINKA's discussion of this topic, which states that "federal authority is split but the trend appears to be that using [an utterance] to prove an implicit assertion is not

¶ 44. One approach, exemplified by *United States v. Zenni*, 492 F. Supp 464, 469 (E.D. Ky. 1980), construed the Federal Advisory Committee's Note, *see supra* note 14, to prevent considering any implicit assertion as an assertion, apparently assuming that an intended assertion is necessarily only an explicit assertion.[22] A second approach, exemplified by *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990), relied on the requirement of intent in deciding that a particular implicit assertion is not intended by the speaker as assertion, thus not foreclosing the possibility that an implicit assertion might be intended as an assertion.[23]

---

hearsay." BLINKA, *supra*, § 801.3, at 535. The State does not discuss any federal cases. As our discussion in ¶ 44 reveals, our own research does not reveal a trend: even when courts conclude an implicit assertion is not hearsay, they do not necessarily affirm the proposition that an implicit assertion can never be hearsay. Our research of state court decisions on this issue also reveals divergent approaches, with more jurisdictions holding that implicit assertions may be hearsay. *Compare Hunt v. State*, 744 So. 2d 851, 857 (Ala. 1999); *Blecha v. People*, 962 P.2d 931, 944 (Colo. 1998); *People v. Thomas*, 687 N.E.2d 892, 902 (Ill. 1997); *Powell v. State*, 714 N.E.2d 624, 627 (Ind. 1999); *State v. Rawlings*, 402 N.W.2d 406, 408–09 (Iowa 1987); *Carlton v. State*, 681 A.2d 1181, 1184 (Md. Ct. Spec. App. 1996); *Houston v. State*, 752 So. 2d 1044, 1048 (Miss. Ct. App. 1999); *State v. Land*, 34 S.W.3d 516, 526 (Tenn. Crim. App. 2000); *and Brown v. Commonwealth*, 487 S.E.2d 248, 252 (Va. Ct. App. 1997), *with People v. Jones*, 579 N.W.2d 82, 88–89 (Mich. Ct. App. 1998), *and State v. Collins*, 886 P.2d 243, 245 (Wash. Ct. App. 1995).

[22] This approach has been followed by the Fifth Circuit in *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990).

[23] The Tenth Circuit followed this approach in *United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996), and concluded that the party claiming that the implicit assertion was intended by the speaker had not met his burden. *See also United States v. Groce*, 682 F.2d 1359, 1364 (11th Cir. 1982).

A third approach, used by the Sixth Circuit in *Lyle v. Koehler*, 720 F.2d 426, 432–33 (6th Cir. 1983), defined the issue as whether the inferences the propounding party sought to elicit from certain letters "should be included within the set of 'assertions' that the letters make"; it concluded they were because the words of the letters "necessarily invited" those inferences and "form[ed] an integral part of the letters." We view this approach as arriving at the intent of the speaker or writer by considering what assertions are necessarily implied in the utterance. Finally, a fourth approach, the one that Daniel propounds, was articulated in *United States v. Reynolds*, 715 F.2d 99, 102–03 (3d. Cir. 1975), where the court focused on the use of the utterance by the proponent and not on the speaker's intent; the court concluded the utterance was hearsay because its probative value depended upon the truth of an assumed fact it implied.[24]

¶ 45. We do not adopt the approach of the Third Circuit, as expressed in *Reynolds*, because it does not take into account the intent of the speaker in determining whether an utterance is an assertion, and we have already decided that is a requirement for an "assertion" under WIS. STAT. § 908.01(1). On the other hand, we are not persuaded by the analysis in *Zenni*, which the State apparently favors, because that analysis assumes without explanation that an assertion does not include an intended expression of a fact, opinion, or condition if it is implicit in the words used. Moreover, the court in *Zenni* acknowledged that some utterances might be intended as an assertion even though the "words [were] non-assertive in form" and such utterances would re-

---

[24] The Second Circuit appears to follow this approach. *See United States v. Dukagjini*, 326 F.3d 45, 57–58 (2d Cir. 2002).

quire a preliminary determination of intent: for example, an airport security inspector that says "go on through" to a passenger after using a metal detector on them might intend to assert that the passenger did not have a gun. *Zenni*, 492 F. Supp at 469 n.21. We also observe that, even when treatises describe the rule in federal courts to be that implicit assertions are not hearsay, they often point out exceptions. *See, e.g.,* MCCORMICK ON EVIDENCE, *supra,* § 250, at 111–12 n.29 (noting in a footnote, that when the utterance "it will stop raining in an hour" is offered to prove it is raining, that is hearsay, because "the fact to be proved is a necessary implication of the utterance").

¶ 46. We conclude that the preferable approach is to include within the meaning of "assertion" in WIS. STAT. § 908.01(1) an expression of a fact, opinion, or condition that is implicit in the words of an utterance as long as the speaker intended to express that fact, opinion, or condition. From the standpoint of the principles underlying the rule against hearsay, we see no reason to distinguish between an explicit and an implicit assertion. As for determining whether the speaker intends an implicit assertion and if so, what that assertion is, we adopt the framework described in the Judicial Council Committee's Note and the Federal Advisory Committee's Note for determining whether non-verbal conduct is intended as an assertion. The burden is on the party claiming that an utterance contains an implicit assertion to show that a particular expression of fact, opinion, or condition was intended by the speaker, and the trial court determines this as a preliminary matter. *See supra* note 14. *See also United States v. Jackson,* 88 F.3d 845, 848 (10th Cir. 1996). Sometimes it will be evident from the utterance itself

that the speaker necessarily intended an implicit asser-
tion. However, when evidence of surrounding circum-
stances is needed to resolve the issue, the party claim-
ing an implicit assertion must present that evidence to
the trial court. *Id.*

¶ 47. In this case, when the prosecutor stated at
the motion hearing that Elizabeth's instruction to her
mother contained a highly relevant inference and de-
fense counsel objected that use of the instruction for
that purpose was hearsay, the trial court should have
decided what implicit assertion, if any, the instruction
contained. Although the trial court did not do so, our
independent review of the record persuades us that a
reasonable trial court could have concluded that the
instruction did not contain an implicit assertion by
Elizabeth that Daniel was dangerous. The instruction
itself does not necessarily imply the assertion Daniel
propounds. That is, the instruction itself necessarily
implies that Elizabeth intended to assert to her mother
that she wanted her mother to come looking for her if
she was not home by 3:45 p.m., but the instruction, in
itself, does not necessarily imply any assertion about
the reason for her request. It was therefore incumbent
upon Daniel to present evidence of the surrounding
circumstances to support his position that Elizabeth
intended to express to her mother that Daniel was
dangerous. It is by no means clear from the submissions
that she intended to express that fact. The submissions
would support a determination that she intended to
express to her mother her fear about what Daniel might
do, which is not the same thing as expressing the fact of

his dangerousness.[25] The submissions are also consistent with her fearing that he would bother her by insisting on talking her into coming back to him or by following her to prevent her from meeting Stahl—not that Daniel would harm her. Accordingly, we conclude there was a proper basis in the record for deciding that the instruction was not an assertion within the meaning of Wis. Stat. § 908.01(1) that Daniel was dangerous.

¶ 48. Because a reasonable judge could have determined that Elizabeth's instruction to her mother did not contain the implicit assertion that Daniel was dangerous, the trial court did not err in denying Daniel's motion to exclude the instruction on hearsay grounds. There may have been other bases on which the instruction could have been properly excluded, such as relevancy or prejudice, or a limiting instruction may have been appropriate to prevent the State from using the instruction to suggest that Daniel was dangerous. However, as we have mentioned above, *see* footnote 9, Daniel did not make any objection other than hearsay and did not request a limiting instruction. We emphasize, however, that nothing in this opinion should be read as approving a practice whereby a proponent of an utterance objected to as hearsay states the utterance

---

[25] We do not understand Daniel to be arguing that Elizabeth intended to express to her mother the condition of her state of mind—that she was afraid. (It appears to us from the prosecutor's comments at the motion hearing that the State in fact agreed she did intend to express that mental condition.) Rather, we understand Daniel is arguing that Elizabeth intended to express a fact about Daniel—that he was a danger to her. We observe that if the assertion was of her state of mind, then the exception in Wis. Stat. § 908.03(3) would be applicable, but only to prove her state of mind, *see infra* ¶¶ 56–62.

will be used for a non-hearsay purpose and then at trial uses it to prove the truth of an implicit or explicit assertion.

## 2. Elizabeth's statements of Daniel following her[26]

¶ 49. Daniel contends the trial court erred in ruling that the following statements of Elizabeth come within the hearsay exception for recent perception: (1) to her mother on July 16, 2000, that Daniel was on her tail all the time; (2) to her mother on July 22, that Daniel had found her in DeForest on that day and pulled out in front of her car and screamed at her for leaving without him; (3) to her mother on July 25 by telephone that she was at Burger King and Daniel had followed her there; (4) to her stepfather on July 21, upon coming into the house, that Daniel was up the road watching her from his car while she was trying to back out; (5) to Stahl by telephone in the evening of July 25, that Daniel had followed him home from work that day and when she was en route to Stahl's apartment earlier in the evening, she saw Daniel in his car and turned in another direction to "throw him off"; and (6) to Stahl, on the morning of July 27, that Daniel had been following her to work for several days and she had seen him on her way to work that morning.[27]

---

[26] The State does not dispute that these statements and those discussed in the next subsection are hearsay and thus are admissible only if they come within an exception.

[27] We do not consider Daniel's challenge on hearsay grounds to Dian Pinney's testimony at trial—that Elizabeth said Daniel was not acting normal, he would not leave her alone, and was following her—because that statement of Dian was not included in Daniel's pretrial motion and he did not object to it at trial.

¶ 50. WISCONSIN STAT. § 908.045(2) is an exception available only if the declarant is unavailable as a witness and provides:

> **(2)** STATEMENT OF RECENT PERCEPTION. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear.

¶ 51. The recent perception exception is similar to the hearsay exceptions for present sense impression and excited utterances, but was intended to allow more time between the observation of the event and the statement in cases where the declarant is unavailable and the evidence would otherwise be lost. *State v. Weed*, 2003 WI 85, ¶ 15, 263 Wis. 2d 434, 666 N.W.2d 485. Given the longer lapse of time allowed between the declarant's perception and description of the event, the exception contains safeguards to insure trustworthiness and accuracy: (1) the event or condition must be recently perceived in relation to the declarant's describing it; (2) the statement must be made while the declaration's recollection is clear; and (3) the statement must not be in response to the instigation of a person engaged in investigating, litigating, or settling a claim and must be made in good faith with no contemplation of pending or anticipated litigation in which the declarant would be an interested party. *Id.*, ¶¶ 14–15. The trial court has wide discretion in deciding whether the time lapse is sufficiently short and whether the statement was made in good faith without contemplation of anticipated litigation. *See Christensen v.*

*Economy Fire & Cas. Co.*, 77 Wis. 2d 50, 63–64, n.13, 252 N.W.2d 81 (1977).[28] In *Kluever v. Evangelical Reformed Immanuels Congregation*, 143 Wis. 2d 806, 813–15, 422 N.W.2d 874 (Ct. App. 1988), the court held that a time lapse of eight to ten weeks between the event and the statement describing constituted a "recent" perception.

¶ 52. We conclude the trial court properly exercised its discretion in ruling that the above six statements came within this exception. As to the last five of these statements, there is no reasonable argument that Elizabeth was not relating events she recently perceived: in each case it was the same day, in some cases during or immediately following the event described. With respect to the first statement, the context provided by Elizabeth's mother's testimony satisfies us that Elizabeth was describing recent events. Elizabeth's mother testified that earlier that same day she herself had seen Daniel follow her daughter around her (Elizabeth's mother's) house, including into the bathroom, and Elizabeth said then he was not letting her out of his sight. In addition, the evidence—both the voluminous witness interviews submitted with the pretrial motion and the evidence at trial—was that Elizabeth and her mother were very close, Elizabeth confided in her mother, and they spoke or saw each other

---

[28] The specific time lapse the court referred to in *Christensen*, 77 Wis. 2d 50 at 63–64, n.13, was that involved in the exception for a present sense impression, Wis. Stat. § 908.03(1), which is shorter—while perceiving the event or condition or immediately thereafter. However, the principle that the trial court has wide discretion in determining if the time lapse qualifies under the particular exception applies equally to Wis. Stat. § 908.045(2).

nearly every day, if not more often. Thus, it is reasonable to infer that Elizabeth was relating conduct that had occurred on that day or within a day or two prior. There is no indication that Elizabeth did not have a clear recollection when she related these six statements.

¶ 53. Daniel argues that these statements were not made in good faith because Elizabeth was involved in an affair with Stahl and therefore had an incentive to disparage her husband to others; also she was contemplating a divorce. However, the trial court took into account that these statements were made to people to whom Elizabeth was close, describing events soon after they occurred. The court decided that, given the nature and circumstances of these statements, Elizabeth made them in good faith notwithstanding that she might be thinking of a divorce. There is no evidence these statements were instigated by anyone. We conclude this was a proper exercise of the wide discretion given the trial court on the issue of the declarant's good faith.

¶ 54. Daniel also argues that corroboration is required for this exception, citing *State v. Stevens*, 171 Wis. 2d 106, 119, 490 N.W.2d 753 (Ct. App. 1992). In that case, we held that the exception "does not apply to the aural perception of an oral statement privately told to a person." *Id.* We reasoned that reliability under this exception depends upon "the possibility of corroborating the declarant's statement," and events and conditions, unlike a statement made in private, are subject to corroboration. *Id.* The supreme court recently discussed *Stevens* in *Weed*, 263 Wis. 2d 434, ¶ 21 n.6. While expressly not overruling *Stevens*, the supreme court noted that "corroboration in and of itself does not determine the admissibility of a hearsay statement under the recent perception exception . . . . Rather, a

statement of recent perception is admissible if the three criteria under [the rule] are met." *Id.*[29] We read *Weed* to mean that our discussion of the possibility of corroboration in *Stevens* was correct in the context of deciding whether the private statement was a "recently perceived event," but the existence of corroboration is not a general requirement under WIS. STAT. § 908.045(2). Accordingly, we do not discuss further whether there was corroboration of the six statements.

### 3. Elizabeth's statements of Daniel's threats

### a) Then-existing state of mind, WIS. STAT. § 908.03(3)

¶ 55. Daniel contends the trial court erred in ruling that the following statements made by Elizabeth were admissible under the "state of mind" exception: (1) to her mother that Daniel said "[i]f you leave me, they can bury us all on the hill" and "[i]f you leave me, you'll never live to see your kids grow up"; (2) to her brother Greg that Daniel said if she left him, she would

---

[29] The complete footnote reads:

> We note that we are not overruling *State v. Stevens*, 171 Wis. 2d 106, 490 N.W.2d 753 (Ct. App. 1992), sub silencio as claimed by the concurrence. *Stevens* dealt with a different issue: what constitutes a "recently perceived event." The court concluded that the recent perception exception "does not apply to the aural perception of an oral statement privately told to another person," reasoning that what must be perceived is an event or condition since "there will generally be no doubt that an event occurred . . . ." *Id.* at 119, 490, 753. We further note that corroboration in and of itself does not determine the admissibility of a hearsay statement under the recent perception exception. *See* concurrence, ¶ 56. Rather, a statement of recent perception is admissible if the three criteria under WIS. STAT. § 908.045(2) are met.

*State v. Weed*, 2003 WI 85, ¶ 21 n.6, 263 Wis. 2d 434, 666 N.W.2d 485, 493 (alteration in original).

not see her kids grow up; (3) to her brother David that Daniel said he would bury them on the hill if she left him; (4) to Sandra Bobholz that Daniel said she would never live to see her kids grow up and they could bury them all on the hill; (5) to Rita Wells that Daniel had threatened to kill her, and said if she ever left him, she would never live to see the children grow up and they could bury all four of them on the hill.[30]

¶ 56. WIS. STAT. § 908.03(3) is an exception applicable whether or not the declarant is available and provides:

> **(3)** THEN EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Daniel contends that this exception is limited to statements a declarant makes about the declarant's state of mind at that time, and Elizabeth's statements about threats Daniel made are not such statements. The State's position is that Elizabeth's statements about Daniel's threats are admissible under this exception to prove he made those threats because they show her state of mind—fear of Daniel—at the time she made the statements.

---

[30] We do not address Daniel's challenge to Jennifer Tomlinson's testimony that Elizabeth told her Daniel had disconnected the phone and threw it up against the wall, or Ellen Falk's testimony that Elizabeth told her Daniel said if she filed divorce papers, "I'll go but I won't go alone." Daniel did not include these in the motion in limine and did not object to this testimony at trial.

¶ 57. We have a difficult time squaring the State's position with the language of the rule. By its terms, the language of this exception applies to statements Elizabeth made to others about her state of mind at the time she made them in order to prove that was her state of mind. Thus, it would plainly allow statements she made to others that she was afraid of Daniel for the purpose of proving she was afraid of him. However, the statements the State seeks to admit under this exception are statements Elizabeth made about Daniel's threats to her in order to prove that he threatened her. Perhaps one may reasonably infer from evidence that Daniel made threats to Elizabeth that she was afraid of him, but that begs the question: what is the evidence he made those threats? Under the State's view, the very statements of Daniel's threats that show her state of mind are admissible under this exception to prove he made those threats. However, both the Judicial Council Committee's Note and the Federal Advisory Council Committee's Note caution against using this exception to allow a declarant's statement to prove the truth of events that have occurred in the past.[31]

---

[31] The Judicial Council Committee's Note provides in part:

Sub. (3). This exception is a specialized version of the present sense impression exception, sub. (1). A special exception is desirable because of widespread reluctance to accept declarations of a state of mind or bodily health to prove the condition because of the problem of trustworthiness. However, legal authorities have determined that the·merit of such a position is directed to the weight and sufficiency of the evidence and the credibility of the declarant, not to the admissibility of the statement.

. . . .

In *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892), a declaration of then-existing state of mind (intention) was held admissible as tending to prove the doing of

579

¶ 58. The trial court relied on *State v. Jackson*, 187 Wis. 2d 431, 435–36, 532 N.W.2d 126 (Ct. App. 1994), in deciding that these statements of Elizabeth were admissible under the state-of-mind exception, as does the State on appeal.[32] In *Jackson*, the husband was

the act intended. However, in *Shepard v. United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 196 (1933), the court held that a declaration of the victim that the defendant poisoned her did not establish the prior act, saying:

"Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, point backwards to the past. These would be an end, or nearly that, to the rule against hearsay if the distinction were ignored."

Thus the exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to comply with the limits prescribed.

59 Wis. 2d at R260–63 (citations omitted).

The Federal Advisory Committee's Note provides in part:

The exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind. *Shepard v. United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 196 (1933).

59 Wis. 2d at R264 (citations omitted).

[32] The trial court also relied on *Simpson v. State*, 83 Wis. 2d 494, 510–11, 266 N.W.2d 270 (1978), which held that threats by an accused toward the victim of a homicide are relevant to prove the state of the accused's mind and the intent to kill. Hearsay was not an issue in *Simpson* and there was no mention at all of Wis. Stat. § 908.03(3). In this case, there is no issue of the relevancy of any threats Daniel made to Elizabeth to prove his state of mind or intent; the issue is whether Elizabeth's statements to others that he made threats are admissible to prove he made them. (If the fact that he made threats to Elizabeth is

charged with first-degree reckless homicide after his wife was killed when, driving at high speed with his car following hers, she crashed into a tree. *Id.* at 434. A witness was allowed to testify that the victim had told the witness a short time before she left work that day that "she was afraid, that she was not going home, that she and [the defendant] had been fighting, that [he] had beaten her once before, and that she feared he would hurt her again." *Id.* at 435. We agreed with the defendant that this testimony was hearsay, but we concluded that it fell within the state-of-mind exception, and we went on to conclude the victim's state of mind was relevant to the State's theory of the case: the State wanted to prove that her husband had caused her death by chasing her which, because she was afraid of him, caused her to speed to get away from him. *Id.* at 436.

¶ 59. The trial court here viewed *Jackson* as supporting admission of Elizabeth's statements of Daniel's threats to her because his threats were relevant to her state of mind and her state of mind was relevant in this case (as an element of the stalking charge), just as the victim's state of mind was relevant to the charge in *Jackson*. However, the issue of relevancy is distinct from the applicability of Wis. Stat. § 908.03(3). Section 908.03(3) does not, by its plain terms, allow a declarant's statements of conduct by another to prove the truth of that conduct solely because that conduct is relevant to declarant's state of mind. Rather, it allows a

properly in evidence, those statements are not hearsay when offered against Daniel and so may be used for any purpose. *See* Wis. Stat. § 908.01(4)(b)(1).) The State does not rely on *Simpson* on appeal and we agree with Daniel that *Simpson* does not support allowing into evidence under § 908.03(3) Elizabeth's statements that Daniel made threats to her for the purpose of proving he made those threats.

declarant's statements about her state of mind to prove her state of mind, relevant or not—that is a separate consideration. In *Jackson*, the declarant's statements included a statement that she was afraid; and it was her fear the State sought to prove, not the acts of the defendant that led to her fear. The issue of whether the declarant's statements of the defendant's conduct was admissible under § 908.03(3) to prove that the conduct had occurred was not raised or addressed in *Jackson*.

¶ 60. Since there are no Wisconsin cases that have resolved this issue, we look to federal cases for guidance in applying the same rule. The federal cases appear consistent in construing this rule to admit a declarant's statement of his or her feelings to prove only how the declarant feels and not to admit a declarant's statements of the cause of those feelings to prove certain events occurred.[33] The cases reason that this construction is necessary to give meaning to the restriction plainly stated in the rule. *See, e.g., United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980).

¶ 61. The State has brought to our attention five cases from other state courts—three of them from

---

[33] *United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994); *United States v. Joe*, 8 F.3d 1488, 1493 (10th Cir. 1993); *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980); *United States v. Day*, 591 F.2d 861, 882 (D.C. Cir. 1978) (citing *United States v. Brown*, 490 F.2d 758, 763–64 (D.C. Cir. 1973)). *See also United States v. Binder*, 794 F.2d 1195, 1202 (7th Cir. 1986); DAVID F. BINDER, HEARSAY HANDBOOK § 12:1, at 12–4 to 12–6 (4th ed. 2001); BLINKA, *supra*, § 803.301, at 606; 2 McCORMICK ON EVIDENCE § 276, at 230–31 (John W. Strong, ed. 5th ed. 1999). When the declarant's state of mind is fear of the defendant, the issue then becomes whether the declarant's state of mind in itself is relevant and, if it is, how much, if any, of the statement to admit in view of the prejudice that may result even with a limiting instruction. *See Brown*, 490 F.2d at 762–67.

North Carolina—that do admit under this exception statements by the declarant relating to factual events that tend to show the victim's state of mind, in order to prove those events occurred.[34] However, this appears to be a minority view among the states.[35] In any event, we do not consider the reasoning of the State's cases persuasive in construing and applying the state-of-mind exception. Their analysis tends to focus not on the language or the purpose of the exception, but on the relevance of the defendant's conduct to the victim's state of mind and the relevance of the victim's state of mind to the charges, using a balancing test similar to

---

[34] *People v. Ortiz*, 642 N.W.2d 417, 423–25 (Mich. Ct. App. 2001); *State v. Lynch*, 393 S.E.2d 811, 818–19 (N.C. 1990); *State v. Cummings*, 389 S.E.2d 66, 74–75 (N.C. 1990); *State v. Hayes*, 502 S.E.2d 853, 866 (N.C. Ct. App. 1998); *Washington v. State*, 989 P.2d 960, 973 (Okla. Crim. App. 1999). The State also cited *State v. Bradley*, 431 N.W.2d 317, 324 (S.D. 1988), in support of its position. However, there the defendant acknowledged that hearsay testimony to the effect that the victim was afraid of him was properly admitted under the state-of-mind exception and contested only whether the victim's fear of him was relevant; the court concluded it was.

[35] The following state cases, like the federal cases, do not allow a declarant's statements that are admissible to prove a then-existing state of mind to prove the defendant's conduct that brought about that state of mind. *State v. Fulminante*, 975 P.2d 75, 88 (Ariz. 1999); *Capano v. State*, 781 A.2d 556 (Del. 2001); *Kennedy v. State*, 385 So. 2d 1020, 1021–22 (Fla. Dist. Ct. App. 1980); *Commonwealth v. Zagranski*, 558 N.E.2d 933, 936–37 (Mass. 1990); *Hase v. American Guarantee & Liability Ins. Co.*, 251 N.W.2d 638, 642 (Minn. 1977); *State v. Machado*, 545 A.2d 174, 180 (N.J. 1988); *State v. Wauneka*, 560 P.2d 1377, 1381 (Utah 1977); *see also People v. Ruiz*, 749 P.2d 854, 863 (Cal. 1988).

Wis. Stat. § 904.03 to guard against unfair prejudice.[36] However, as the court in *Capano v. State*, 781 A.2d 556, 611 (Del. 2001), pointed out in rejecting the approach of those cases, the "[h]earsay rule is designed to exclude statements untested by cross-examination that are insufficiently reliable due to possible defects in the declarant's memory, perception or veracity," while the analysis of rules such as § 904.03 "assumes that these reliability concerns are overcome and focuses on balancing the effects of the statement on the jury."

¶ 62. We conclude the trial court erred in ruling the above six statements of Elizabeth were admissible under the state-of-mind exception to prove the threats were made.[37] We therefore next consider whether they were admissible under the other exceptions argued by the State.

---

[36] Wisconsin Stat. § 904.03 provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[37] The State does not contend on appeal and did not contend in the trial court that these statements were admissible under this exception only for the limited purpose of proving that Elizabeth was afraid of Daniel. We note that there was ample evidence admitted at trial that Elizabeth was afraid of Daniel in the time period shortly before her disappearance.

### b) Statement of recent perception, WIS. STAT. § 904.045(2)

¶ 63. The State contends that these six statements are admissible under the recent perception exception because the evidence showed that Daniel had made the threats to her a short time before she related them to others, there is corroboration, and the other conditions of the rule are met. However, as we have stated above, in *Stevens*, 171 Wis. 2d at 119, we held that the exception "does not apply to the aural perception of an oral statement privately told to a person." The State's reading of *Stevens*—that "event or condition" may include a private oral statement aurally perceived if there is corroboration—is not viable after *Weed*, 263 Wis. 2d 434, ¶ 21 n.6. *See supra* ¶ 54. While there may be good arguments for construing "event or condition recently perceived" by the declarant to include an oral statement heard by a declarant, we conclude we are bound by *Stevens* as interpreted by *Weed*.

### c) Excited utterance, WIS. STAT. § 903.03(2)

¶ 64. The State contends that one of the six statements—to Sandra Bobholz that Daniel said she (Elizabeth) would never live to see her kids grow up and that they could bury them all on the hill—was an excited utterance under WIS. STAT. § 908.03(2). That exception applies to a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Section 908.03(2).

> "The excited utterance exception . . . is based upon spontaneity and stress" which, like the bases for all

exceptions to the hearsay rule, "endow such statements with sufficient trustworthiness to overcome the reasons for exclusion of hearsay."

Accordingly, the excited utterance exception has three requirements. First, there must be a "startling event or condition." Second, the declarant must make an out-of-court statement that relates to the startling event or condition. Finally, the related statement must be made while the declarant is still "under the stress of excitement caused by the event or condition." Essentially, "[i]t must be shown that the statement was made so spontaneously or under such psychological or physical pressure or excitement that the rational mind could not interpose itself between the spontaneous statement or utterance stimulated by the event and the event itself."

. . . . .

. . . "[T]ime is measured by the duration of the condition of excitement rather than mere time elapse from the event or condition described."

*State v. Huntington*, 216 Wis. 2d 671, 681–83, 575 N.W.2d 268 (1998) (first alteration in original) (citations omitted).

■■■
¶ 65. We agree with the State that the first two elements of this exception are met: Daniel's threat to Elizabeth is a startling event and her statement to Bobholz certainly relates to it. However, we cannot agree that a reasonable trial judge on this record could conclude that when Elizabeth told Bobholz the next morning of Daniel's threat, she was still under the stress of the excitement from the night before. There is no basis for inferring that, from the time of the threat the night before until she related it to Bobholz, Eliza-

beth had no time to reflect and no break in the stress caused by the excitement of the threat. The State does not provide us with any case that applies the exception in a similar fact situation, and we have been able to locate none.[38]

C. Harmless Error

¶ 66. Because we conclude that Elizabeth's six statements of Daniel's threats were hearsay and do not come within any of the exceptions argued by the State, we must decide whether these errors are harmless. An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *State v. Harvey*, 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189. This analysis requires that we weigh the effect of the erroneously admitted evidence against the totality of the credible evidence supporting the verdict. *State v. Britt*, 203 Wis. 2d 25, 41, 553 N.W.2d 528 (Ct. App. 1996).

¶ 67. We have carefully read the transcript of the trial, weighing the six statements of threats against all the evidence supporting the verdict, and we are satisfied beyond a reasonable doubt that a rational jury

---

[38] The special considerations when a child is the declarant are not involved. *See Huntington*, 216 Wis. 2d at 682–83. For adults, an event of an extreme nature that has a severe effect on the declarant has been found to justify a lapse of a few hours. *See State v. Boshcka*, 178 Wis. 2d 628, 640–41, 496 N.W.2d 627 (Ct. App. 1992) (statements made within a few hours after declarant suffered a repeated and aggravated sexual assault and threat of death should she report it, made to the first people she talked to after the incident). Here we have a longer time lapse and less extreme circumstances.

would have found Daniel guilty of each of the four offenses absent that evidence.

¶ 68. Before discussing each of the charges, we observe that the jury heard other evidence of threats Daniel made to Elizabeth. Ellen Falk testified that Elizabeth told her, on approximately July 23, 1999, that Daniel had said if she served him with divorce papers he would go and he would not go alone; Jennifer Tomlinson testified that shortly before July 27, 1999, Elizabeth told her that a couple of weeks earlier Daniel had locked her in the bathroom and told her he would not let her out until she said she would not leave him.[39] In nonhearsay evidence, Elizabeth's stepfather, Vernon Maier, testified that he heard Elizabeth and Daniel arguing and heard Daniel holler "that if she left him, they could bury all four of them on the hill," meaning the 180 acres Elizabeth and Daniel owned. He testified on direct this argument took place in early July 2000, but on cross-examination he acknowledged that an earlier statement placing this argument in the middle of April was correct.

¶ 69. Addressing first the stalking charge, there was much more direct and powerful evidence on each element than the six statements of threats that were erroneously admitted.[40] The "course of conduct" by

---

[39] As we have noted above, while Daniel challenges this testimony of Ellen Falk on appeal, he did not object to this testimony in the trial court, either at trial or by motion in limine. *See supra* note 30. Also, there were at least three witnesses besides Tomlinson who testified that Elizabeth told them Daniel had locked her in the bathroom and, as we have noted above, Daniel did not preserve his hearsay objections to this testimony. *See supra* ¶ 30.

[40] At the time relevant to this action, the elements of stalking were:

Daniel was established by the testimony of Elizabeth's statements that he was following her, which we have discussed above and concluded were admissible hearsay, and by non-hearsay testimony from a number of witnesses. This latter testimony described Daniel following her from room to room in her mother's house the week before July 20; waiting for her right outside the hair salon on July 19; pulling in front of her vehicle in DeForest around July 20, and following her back to the parking lot where he got out of his car and went to her car window and they argued; following her to work a few days before July 27; and following her into her mother's driveway on July 25. In addition, witnesses saw him in his vehicle at and near her place of work at least three different times on July 27; and in his own statement to the police, he described parking at a spot where she would pass on her way home from work on July 27, and flagging her down when she went by. This evidence of Daniel's conduct, when viewed along with the evidence that he locked her in the bathroom from

> (a) The actor intentionally engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or herself or a member of his or her immediate family or to fear the death of himself or herself or a member of his or her immediate family.

> (b) The actor has knowledge or should have knowledge that the specific person will be placed in reasonable fear of bodily injury to himself or herself or a member of his or her immediate family or will be placed in reasonable fear of the death of himself or herself or a member of his or her immediate family.

> (c) The actor's acts induce fear in the specific person of bodily injury to himself or herself or a member of his or her immediate family or induce fear in the specific person of the death of himself or herself or a member of his or her immediate family.

WIS. STAT. § 940.32(2) (1999–2000).

which she escaped through a window and ripped the phone off the wall, throwing it against the wall and not letting her make phone calls, is compelling evidence that he engaged in a course of conduct that would induce fear of bodily injury or death in a reasonable person, and that he intended to do so with at least one of his acts. WIS. STAT. § 940.32(2)(a) and (b) (1999–2000). There was, in addition, ample evidence that Daniel's conduct did induce fear in Elizabeth: she had her mother go with her to get things from the house where Daniel remained, she had her mother go instead of her to fetch her purse from the house, she changed her time of going to work to try to avoid him, she took the golf cart out the back way of her mother's house with the children to avoid him in the driveway, and she expressed her fear to many family members and friends.

¶ 70. With respect to the homicide charge, Daniel conceded in closing argument that the evidence established that Elizabeth was dead because there was no other rational explanation for her not having appeared or been found since July 27, 2000. Thus the issue was whether Daniel caused her death with the intent to kill her. WIS. STAT. § 940.01(1)(a) (1999–2000). The jury heard the following evidence of Daniel's motive to kill her: their relationship was deteriorating; he knew she was having an affair; July 27, 2000, was the last day on which they could prevent foreclosure of the 180 acres they owned and Elizabeth had refused his entreaties to quit her job to use her pension to prevent foreclosure; and she had just moved out to stay with her mother, a concrete signal of the end of their marriage. Moreover, besides the evidence of Daniel's threats that were not erroneously admitted, the jury heard evidence that he

had become increasingly controlling and intimidating in his behavior toward Elizabeth in the days just preceding July 27.

¶ 71. According to Daniel's own statements to the police, described in the first section and introduced at trial through the officers' testimony, he was with Elizabeth after she left work on July 27 and was the last person known to have been with her. Thus, he clearly had the opportunity to kill her.

¶ 72. Daniel told a number of lies in his statements to police officers about what he did on the evening of July 27 that provide a basis for a reasonable jury to infer his consciousness of his guilt. He initially denied to the officers who picked him up on the highway that he had been with Elizabeth; he said he had been with a number of people in a car at the Stop-N-Go whom he did not know and with whom he had argued and had accidentally left his shoes in their car. This lie is strong evidence that he had harmed Elizabeth and did not want anyone to know he had been with her. Daniel also lied when he told other officers that he had parked his blue Cavalier at a spot on Elizabeth's way home from work to wait for her. The evidence at trial showed that, after he had been confronted by Stahl while parked in his car next to Demco that afternoon before Elizabeth was finished with work, he had borrowed his brother's car; and he was in that car when he stopped Elizabeth on her way home from work. There is a strong inference from this exchange of cars that he did not want his car to be identified.

¶ 73. As we have stated in our discussion of probable cause to arrest, Daniel's story about Elizabeth leaving him at the Stop-N-Go to go to Portage is not a credible explanation for how he wound up on the highway with no shoes, no shirt, and pants wet from the

knees down. Although Daniel said he drove around with Elizabeth talking for what would have been about six hours,[41] he could not explain where he had been other than Token Creek Park. However, a witness placed the Jeep turning into the 180 acres he and Elizabeth owned at about 3:35 p.m. on July 27, and the key to Daniel's brother's car, which Daniel had left locked, was found on the 180 acres. Daniel's lack of interest in what happened to Elizabeth is additional evidence of his guilt.

¶ 74. There was also physical evidence that Daniel killed Elizabeth. First, her blood was on his watch and there was no reasonable explanation for this other than that her blood got there when he killed her. Second, the only fingerprint found on the Jeep that Elizabeth had been driving for five days was Daniel's—on the outside of the driver's door near the handle. The trial evidence showed that she had borrowed the Jeep from a friend on July 23 and washed it on July 26. The Jeep was found in the Meriter parking ramp in Madison, Wisconsin, about noon on July 29, 2000. Washing the Jeep on July 26 might have eliminated some fingerprints, but she drove it the next day and there was evidence that, while she was washing the Jeep, her son was inside pretending to drive. Daniel's lone fingerprint is convincing evidence that Daniel wiped the fingerprints off the inside of the Jeep. Third, Elizabeth's blood was found in the cargo area of the Jeep, and Daniel told police he had been in the Jeep with her. The defense attempted to suggest at trial that the blood came either from Elizabeth menstruating or from biting her fingernails, but a reasonable jury would

---

[41] The videotape at the Stop-N-Go showed Daniel was there at 9:21 p.m.

find neither explanation convincing after viewing the photographic evidence of the blood; in addition the evidence was that Elizabeth had stopped menstruating on July 22. Elizabeth's blood in the cargo area of the Jeep is powerful evidence that she was killed there or her dead or injured body was carried there, and the blood on Daniel's wristwatch and lone fingerprint on the Jeep convincingly ties Daniel to her murder.

¶ 75. Although no murder weapon was found, there was evidence that Daniel had carried a knife in the trunk of his car, and the knife was not there when his car was searched. There was also evidence that a five-tine fork and a shovel were missing from the farm where Daniel remained living after Elizabeth moved to her mother's house.

¶ 76. The State's theory of what happened after Daniel killed Elizabeth and disposed of her body was that he drove the Jeep to Madison and parked it in the Meriter ramp, then walked north until he was picked up on the highway.[42] The State presented witnesses who placed the Jeep in the Meriter parking lot at approximately 6:15 p.m. on July 27 and in the early morning of July 28 and July 29 in the same spot it was found by police on July 29.

¶ 77. The defense presented the testimony of numerous people who described a vehicle that was the same as or similar to this Jeep with the same or similar license plate (DIDIS), which they saw at various times between the evening of July 27 and noon on July 29 at

---

[42] The State presented evidence that the unopened blisters and other marks on Daniel's feet were consistent with having walked most of this distance in his boots, which were never found, and were not consistent with his statement that he walked in stocking feet 2.5 miles from the Stop-N-Go to where he was picked up.

various locations in and north of Madison. Some of the witnesses described one person in the vehicle; others described two. Some of the descriptions of a woman in the vehicle were similar to Elizabeth's appearance; others were not. The descriptions of the man seen by some in the vehicle were not consistent. The defense theory was that Elizabeth was alive when she left Daniel and drove off in the Jeep, and it was she and perhaps a person she later met, who perhaps killed her, who were seen in the Jeep while Daniel was in custody after his arrest. However, a number of these defense witnesses were uncertain about what they actually saw and when they saw it and appeared influenced by television reports. Many of the accounts were inconsistent with other accounts. More importantly, the defense theory is not consistent with Daniel's fingerprint being the only one found on the Jeep; and a sighting or sightings of the Jeep driven after Daniel abandoned it does not tend to prove he did not kill Elizabeth before abandoning the Jeep. Most important, the defense theory requires the jury to overlook the compelling evidence of Daniel's guilt.

¶ 78. We are satisfied beyond a reasonable doubt that a reasonable jury would have come to the same conclusion of guilt on the homicide charge without the evidence of the six statements of threats by Daniel. The evidence supporting that charge, plus the undisputed evidence of the extensive efforts to find Elizabeth's body, leads us to the same conclusion for the charge of hiding a corpse.[43]

---

[43] The elements for this offense are hiding a corpse with the intent to conceal a crime or avoid apprehension, prosecution, or conviction for that crime. WIS. STAT. § 940.11(2) (1999–2000).

¶ 79. Finally, the six statements of threats were not relevant to the charge of obstructing an officer.[44] We conclude beyond a reasonable doubt that a reasonable jury would not have considered that evidence in deciding whether Daniel was guilty of this charge. Beyond a reasonable doubt, a jury would have reached the same verdict of guilty on this charge based on the evidence of the lies Daniel told the police.

*By the Court.*—Judgment affirmed.

---

[44] The relevant elements of this offense are knowingly giving false information to a police officer who is acting in an official capacity with lawful authority, with the intent of misleading the officer in the performance of his or her duty. WIS. STAT. § 946.41(1) (1999–2000).