COURT OF APPEALS
DECISION
DATED AND FILED

August 2, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1637**

STATE OF WISCONSIN

Cir. Ct. No. 1996CF961629

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DARRELL AFERON MORROW,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: T. CHRISTOPHER DEE, Judge. *Affirmed*.

Before Donald, P.J., White and Gundrum, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.    Darrell Aferon Morrow appeals the order denying his petition for discharge from WIS. STAT. ch. 980 (2019-20)[1] commitment. Morrow argues that the trial court admitted hearsay treatment progress notes without a valid exception.   We conclude that the statements were generally admissible as public records and reports pursuant to WIS. STAT. § 908.03(8). Further, any statements admitted in error were harmless.   Accordingly, we affirm.

## BACKGROUND

¶2      In 1990, Morrow was convicted of first-degree sexual assault, armed robbery, false imprisonment, second-degree recklessly endangering safety, and carrying a concealed weapon.   In 1996, the State petitioned the trial court to detain Morrow as a sexually violent person within the meaning of WIS. STAT. § 980.01(7) (1995-96).   The trial court found Morrow was a sexually violent person and committed him to the custody of the Department of Health and Social Services, the predecessor agency to the Department of Health Services (DHS).   He was placed at Sand Ridge Secure Treatment Center (Sand Ridge) in 2001 and remains detained there.

¶3      In April 2018, Morrow filed a *pro se* petition for discharge from ch. 980 commitment.[2]   In November 2018, the trial court received the Chapter 980

---

[1]  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2]  Morrow has previously appealed his ch. 980 commitment. *See e.g. State v. Morrow*, No. 2005AP672, unpublished slip op. (WI App Aug. 22, 2006); *State v. Morrow*, No. 2014AP1150-NM, unpublished slip op. (WI App Dec. 17, 2015); *State v Morrow*, No. 2017AP990-NM (WI App Jan. 12, 2018); *State v. Morrow*, No. 2018AP327-NM, unpublished slip op. (WI App Jul. 23, 2018); *State v. Morrow*, No. 2018AP681-NM, unpublished slip op. (WI App Dec. 7, 2018).   None of the appeals resulted in a change of his status under the ch. 980 commitment order; further, they are not relevant to the question before us and we address them no further.

Re-examination Report from Dr. Charles Lodl, who interviewed Morrow and reviewed historical documents provided by his attorney and current treatment records from Sand Ridge. Dr. Lodl opined that "[g]iven his age … physical condition, and his current assessment of risk…he no longer meets the criterion that he is 'more likely than not' to commit a future violent sexual offense. Therefore, I recommend … Mr. Morrow be considered for discharge from his Chapter 980 commitment." Dr. Lodl reaffirmed his recommendation in a Chapter 980 Re-examination Report - Update to the court submitted in January 2020.

¶4 In March 2019, the court received the Department of Health Services (DHS) Chapter 980.07 and Treatment Progress Report, which included the opinion of Dr. William Merrick, a licensed psychologist employed by the State of Wisconsin as a Chapter 980 evaluator. Dr. Merrick determined that Morrow did "not meet the requirement for supervised release under 980.08(4)." He further opined that Morrow's "risk to commit a sexually violent act as defined by the Chapter 980 statute is more likely than not should he be discharged from his commitment." Dr. Merrick concluded that the treatment progress notes showed that Morrow was "not making significant progress in treatment at this time."

¶5 The court conducted a trial on Morrow's petition in January 2020. Dr. Merrick testified that he was assigned by DHS to conduct the annual evaluation of Morrow pursuant to WIS. STAT. § 980.07. He first evaluated Morrow in 2016 and he reviewed the available records including those from DHS, Department of Corrections (DOC), medical record notes, treatment progress notes, case notes, and social work therapeutic services records. He concluded that Morrow continued to meet the qualifications for ch. 980 commitment in 2016, 2017, 2018, and 2019.

¶6    During Dr. Merrick's testimony, the State introduced and reviewed records of treatment progress notes from Sand Ridge staff, exhibits eight through twenty-six.[3]  Morrow's counsel raised a concern about hearsay statements within the exhibits containing treatment progress notes, particularly for statements attributed to anyone other than Morrow.  The State argued that treatment progress notes were admissible as treatment records "among many, many other reasons." Morrow's counsel did not object to exhibits eight through twelve and those exhibits were received by the court.  During the discussion over the admission of exhibit thirteen, Morrow's counsel asked for a "standing objection to records admitted for treatment purposes," which the court allowed.  From that point on, the court acknowledged Morrow's hearsay objection to the remaining progress treatment note exhibits, a total of fourteen exhibits in all.  The exhibits and the statements Morrow challenges on appeal are detailed below.

¶7    Dr. Merrick testified that exhibit thirteen contained progress treatment notes from Alan Tripp, LCSW, Morrow's personal individual treatment provider at Sand Ridge, from April 14 through 19, 2019.  Counsel noted that it contained two types of statements, first statements by Morrow that included "earlier in his life that his sex drive is out of control" and recalling his time in the community, saying "crime was fun," and "[t]he money was fun."  Second, there was a comment from the note author, Tripp, who observed "that Mr. Morrow

_____

[3] We note that the record reflects that exhibits eight, ten, seventeen through twenty-one, twenty-three, and twenty-four were treatment progress notes from Sand Ridge unit staff; exhibits eleven through thirteen, fifteen, sixteen, twenty-two, twenty-five, and twenty-six were individual treatment progress notes from Alan Tripp, LCSW, at Sand Ridge; exhibit nine was treatment progress notes from another DHS provider; and exhibit fourteen contained progress notes from a psychiatric assessment, which also contained comments attributed to other staff members or providers.  We note that exhibit ten was received without objection at trial, but the exhibit itself was not included in the appellate record.

would benefit from developing a more realistic vision of his community living environment." Morrow's counsel objected that conclusions by Sand Ridge staff members were hearsay. The State responded that the first was Morrow's own statement, admissible as statements against penal interest. The State argued that the second was "treatment records and they certainly are admissible in 980 trials for the purposes of illustrating the elements." The court agreed that the statement appeared to be "a statement of treatment, or treatment needs or observation for diagnosis, or prognosis … so I will receive it."

¶8     Next, Dr. Merrick testified about exhibit 14,[4] which contained the psychiatry assessment and progress notes from Dr. [Brigitte] Espinoza, a Sand Ridge psychiatrist, in June 2019. Dr. Merrick commented about a note within the report that stated: "After being referred for a chest x-ray because [Morrow] was coughing up blood … they put a tube down his throat and pulled out a seven-inch toothbrush that he said he didn't know how it got there." Within the same report, Morrow reported that the toothbrush "must have been there for twenty years because in the past he would also eat these strange things in a possible suicide attempt, things like a bottle cap, a Styrofoam cup, and in the remote past a toothbrush again." In addition to the comments regarding the suicide attempt, Dr. Espinoza noted a "fixed delusion" that Morrow believed he

---

[4] For ease of reading, we note in this and the following footnotes the statements that Morrow challenges in the relevant exhibits. Although he challenges the progress treatment notes in general, and a total of fourteen exhibits had objections noted at trial, Morrow identifies on appeal ten statements within seven exhibits as erroneously admitted. From exhibit fourteen, Dr. Espinoza's June 2019 psychiatric assessment included a patient history and a statement from a social worker dated 5/30/2003: "1-24-97- cut electrical cord, grabbed bare wire and plugged into socket … Attempted to eat objects like a bottle cap, toothbrush and styrofoam cup. He tried to hang himself in 1990[.]"

would "make millions of dollars as the result of a lawsuit for being unlawfully committed."

¶9 Dr. Merrick then testified about exhibit fifteen,[5] which contained Tripp's treatment progress summary from September 2019. Morrow was engaged in individual therapy as opposed to group therapy for sex offenders because of "the limitations with his mental disorder … and he had some difficulties getting along with other patients and sometimes staff members." Dr. Merrick testified that Morrow received three of the least serious type of conduct sanctions, which are called "counsels" at Sand Ridge, during July 2019 and August 2019. Dr. Merrick agreed with Tripp's observation that Morrow's periods of increased irritability appeared to coincide with an increase in positive symptoms of his mental illness. Dr. Merrick also agreed with Tripp's observation that Morrow is not able to question or effectively engage in reality testing.

¶10 Dr. Merrick next addressed exhibit sixteen, which contained Tripp's individual treatment progress notes from September 2019. Tripp memorialized two of Morrow's fixed delusions: rampant sexual activity among the staff and concerns about making money from the publication of his autobiography. Dr. Merrick agreed with Tripp's observation that Morrow demonstrated no insight into the nature of his beliefs about the staff.

---

[5] From exhibit fifteen, Morrow identifies as hearsay three statements from Tripp: (1) "It appears Mr. Morrow's mental illness impacted the expression of his sexual behavior and impulsivity"; (2) "Mr. Morrow's major mental illness interferes with his ability to benefit from traditional sex offender programming"; and (3) "In mid to late July [2019], unit staff noted what appeared to be an increase in Mr. Morrow's irritability as evidenced by arguments and critical comments toward peers and staff[.]"

¶11    Next, Dr. Merrick testified about exhibit seventeen,[6] which contained unit treatment progress notes from September 2019 referencing two of Morrow's statements.  First, Morrow stated, "I am sick of you telling me the rules" referring to another patient speaking to him.  Second, he stated, "I do what I want, all you staff break all the rules here anyway so what is the fucking difference if I do."

¶12    Dr. Merrick testified that exhibit eighteen[7] contained unit treatment progress notes from October 2019, which stated that Morrow refused to take his medication on October 3, 2019.  Morrow eventually complied and took his medication.

¶13    Dr. Merrick next discussed exhibit nineteen,[8] which contained unit treatment progress notes from October 14, 2019.  Morrow was notified by staff members, that Morrow should not be sitting and watching the staff members and other patients coming and going to "seeming to keep an eye on them."  The notes record Morrow's response as "you can tell me that all the time, I don't care, I am going to do what I do.  I have been here eighteen years and I deserve special treatment."

---

[6] From exhibit seventeen:  "[Patient] Morrow brought the food tray cart … into the hallway ….  [Morrow] could be heard yelling in the Hallway.  [Morrow] when he returned to his unit writer stated to Morrow there is no yelling in the hallway."

[7] From exhibit eighteen:  Morrow "sat at the patient phone station after dinner staring out the window.  After dinner, at [5:00 p.m.] medication pass arrived on unit.  Patient was asked to go to the dayroom[.]"

[8] From exhibit nineteen: "This [unit] writer peeked into the [multi-purpose room] and noticed that [Patient] Morrow was not reading or even looking at the papers.  [Morrow] would stare out into the hall and watch for other patients and staff coming through the sally ports and into the other units."

¶14    Dr. Merrick testified about unit treatment progress notes in exhibit twenty, from October 21, 2019, when Morrow was again told not to watch staff. The notes recorded his response (without quotation marks) as I am tired of being harassed from staff every fucking day. Dr. Merrick opined that his insistence on watching staff despite being told not to do so may possibly be "a combination of the personality disorder and … some micro-decompensation of his mental status due to the schizoaffective disorder."

¶15    Dr. Merrick next addressed exhibit twenty-one,[9] unit treatment progress notes from October 23, 2019, which included comments from a female psychiatric care technician, who stated that Morrow asked her if any of the "higher ups" asked the technician for sexual favors. The technician told him no and that his thought might be part of his delusions and he admitted that might be true.

¶16    Dr. Merrick testified about exhibit twenty-two, which contained Tripp's individual treatment progress notes from November 13, 2019. Morrow commented that "you ain't hearing me crossing women's boundaries, it is because I ain't doing that." And he also stated that he continued to believe that women staff members were engaging in sexual contact with other patients and that bedtime was a challenge every night because women staff members came into the unit and may ask him for sex.

---

[9] From exhibit twenty-one: "It was approximately [8:25 p.m.], before the evening medication pass. [] Morrow waited to approach the PCT desk until [the report] writer[] was alone sitting at the desk. Patient asked me 'have any higher ups asked you for sexual favors.'"

¶17 Dr. Merrick testified about exhibit twenty-three,[10] which included unit treatment progress notes from November 11 to 13, 2019. The notes detail Morrow's troublesome behaviors in the unit including a sing-song voice, rhyming in almost every verbal interaction, and turning up the volume on music in the day room and leaving. Dr. Merrick opined that these behaviors could be a sign that Morrow has been a resident of Sand Ridge for almost two decades and he is bored, but may also indicate "rabble rousing or causing upset."

¶18 Dr. Merrick testified about unit treatment progress notes from November 18, 2019, in exhibit twenty-four. Morrow asked a female employee how many personalities she thought Morrow had. Dr. Merrick opined that based on his review, he did not believe Morrow had a diagnostic issue with multiple personalities.

¶19 Dr. Merrick testified about exhibit twenty-five, which contained Tripp's individual treatment progress notes from November 25 through 29, 2019. Morrow told Tripp that he was not ready to leave Sand Ridge.

¶20 Dr. Merrick testified about exhibit twenty-six, which contained Tripp's treatment progress summary from December 9 through 13, 2019. Morrow stated that he was preoccupied with sex. Tripp made a note that "Mr. Morrow has caught himself before soliciting women's staff even though he is experiencing more symptoms and is not able to consistently question or effectively engage in reality testing." Dr. Merrick agreed with Tripp's assessment.

---

[10] From exhibit twenty-three: "Morrow has been antsy on the unit. [Morrow] will sit in the [multi-purpose room] and stare at patients and staff[.]" Additionally, in Morrow's appeal, he objected that the exhibit contained "13 bullet points of observations of Morrow's behavior on the unit[.]"

¶21    Finally, Dr. Merrick testified about his evaluation of Morrow and the reasoning behind his opinion that Morrow's mental disorders predisposed him to engage in future acts of sexual violence and that it was more likely than not that Morrow would engage in future acts of sexual violence.  Dr. Merrick testified about discerning the future risk of Morrow committing an act of sexual violence using assessment tools including the STATIC-99 and calculations to extrapolate lifetime risk, and the results of prior administration of the Psychopathy Checklist, Revised.  Dr. Merrick did not recommend granting the petition for discharge.

¶22    Morrow then called Dr. Lodl,  who testified that he maintained his opinion that Morrow no longer fit the criteria for continued commitment, with a risk of less than 50%.  Dr. Lodl testified about the assessment tools he employed in reaching his conclusions, tools which included the Structured Risk Assessment—Forensic Version, STATIC-99R and the Violence Risk Scale Sex Offender version.  Additionally, Morrow testified on his own behalf.

¶23    The court reviewed the case in its oral ruling, stating that there was no dispute that Morrow had a previous conviction for a sexually violent offense as defined by WIS. STAT. § 980.01(6), and that Morrow was diagnosed with a mental disorder predisposing him to commit acts of sexual violence as defined by WIS. STAT. § 980.01(2).  The dispute was whether Morrow satisfied the third factor in ch. 980 commitment or discharge, whether Morrow was more likely than not— which the court stated is more than a 50% chance—to commit sexual violent acts in his lifetime.  The court considered the expert opinions of Dr. Merrick and Dr. Lodl, noting the different risk assessment tools each employed in analyzing Morrow.

¶24    The circuit court noted that "there was one fact in this case … I would term it a big needle mover."  The court stated that the testimony of both doctors showed "perhaps in different terms and perhaps with different emphasis … that Mr. Morrow hasn't come to grips with, hasn't fully admitted, hasn't fully acknowledged what it is that resulted in his first-degree sexual assault conviction."  Because of Morrow's inability to accept the nature of his previous crime, the court found "that a great deal more weight should be afforded to Dr. Merrick's testimony and assessments."  The court found that the State proved this third element by clear and convincing evidence.  Accordingly, the court denied Morrow petition for discharge, and issued a written decision finding that Morrow was still a sexually violent person.

¶25    This appeal follows.

## DISCUSSION

¶26    Morrow argues that the trial court erred when it admitted exhibits containing Morrow's treatment progress notes from Sand Ridge.  Morrow argues that the treatment progress notes do not fall within an exception to the prohibition on hearsay, rejecting claims that the notes would fall within the exception for "statements for purposes of medical diagnosis or treatment" under WIS. STAT. § 908.03(4) or as records of regularly conducted activity under § 908.03(6).  Conversely, the State contends that the treatment notes fall under the exception for public record and reports under § 908.03(8).

¶27    Out-of-court statements offered to prove the truth of the matters asserts within them constitute hearsay and are excludable under WIS. STAT. § 908.02 unless the statements are admissible under a hearsay exception under WIS. STAT. §§ 908.03, 908.04, 908.045.  *See **State v. Sorenson***, 143 Wis. 2d 226,

240, 421 N.W.2d 77 (1988). "The admission of out-of-court statements pursuant to an exception to the hearsay rule is a determination left to the discretion of the circuit court." *State v. Huntington*, 216 Wis. 2d 671, 680, 575 N.W.2d 268 (1998). This court "may review the record to determine if a statement is admissible under a particular hearsay exception even though the [circuit] court did not admit the statement on that basis." *State v. Kutz*, 2003 WI App 205, ¶33, 267 Wis. 2d 531, 671 N.W.2d 660. "Furthermore, if evidence has been erroneously admitted or excluded, we will independently determine whether that error was harmless or prejudicial." *State v. Keith*, 216 Wis. 2d 61, 69, 573 N.W.2d 888 (Ct. App. 1997).

¶28    As a threshold matter, Morrow posits that the treatment progress notes constituted inadmissible hearsay and he provided a "representative sample" of his concerns.[11] There were fourteen exhibits for which trial counsel's objection was noted as the circuit court received the exhibit. The State asserts that Morrow has failed to specify what within the fourteen objected-to exhibits he is asking the court to review on appeal and the State objects to having to speculate. Here, we note that Morrow only identifies specific issues with seven exhibits: a statement by a social worker within the psychiatric assessment, three observations by Tripp, and five statements within unit treatment progress notes. While Morrow offers some specific instances of hearsay, ultimately, we review his contention that the treatment progress notes were inadmissible overall.

---

[11] We noted Morrow's "representative sample" of challenged statements in the relevant testimony from Dr. Merrick in the background above, paragraphs seven through twenty.

12

¶29    Morrow's first argument is that the treatment progress notes do not comply with the strictures of WIS. STAT. § 908.03(4) for medical diagnosis or treatment.[12]    When exhibit thirteen was introduced, trial counsel objected that Tripp's observations about Morrow were hearsay.    The court stated, "It does appear to be a statement of treatment, or treatment needs or observation for diagnosis, or prognosis or under any of that, so I will receive it."    However, under Wisconsin law, "the hearsay exception for statements made for medical diagnosis or treatment, []§ 908.03(4)," does not apply "to statements made to counselors or social workers."  *Huntington*, 216 Wis. 2d at 695.    Arguably, with an exception for exhibit fourteen, which was prepared by a psychiatrist—and for which Morrow raises a double hearsay objection—the challenged exhibits are all treatment progress notes prepared by a social worker or unit notes prepared by various staff members.    Therefore, subsection (4) is not a proper exception for exhibits thirteen and fifteen through twenty-six.    Although the record suggests the State considered admissibility under this exception at trial, the State does not renew or argue this exception on appeal.

¶30    Morrow's next objection is that the treatment progress notes did not fall within the exception for regularly conducted business activities, under WIS. STAT. § 908.03(6)[13] or patient health care records, under § 908.03(6m).[14]

---

[12] "WISCONSIN STAT. § 908.03(4) provides an exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

[13] The regularly conducted activities exception applies to

(continued)

Subsection (6) requires testimony by the records custodian or certification of the notes, neither of which were provided, Morrow argues. The notes were introduced by Dr. Merrick, who was not the custodian of the records. Subsection (6m) makes a records custodian unnecessary if the records were either submitted or made available to all parties at least forty days prior to trial. The State does not argue it timely provided the records as patient health records and it does not assert it relied upon this exception. We conclude that neither the exceptions under subsection (6) nor subsection (6m) are applicable under the record before us.

¶31     The State argues on appeal that the records are admissible as public records and reports. This exception allows the court to admit:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law, or (c) in civil cases and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

---

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with s. 909.02 (12) or (13), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

WIS. STAT. § 908.03(6).

[14] The patient health care records exception applies to statutorily defined patient health care record by health care providers. A custodian of the records is unnecessary if at least forty days prior to trial, "the party who intends to offer patient health care records into evidence" serves or offers for inspection "accurate, legible, and complete duplicate" of the records to all parties. WIS. STAT. § 908.03(6m).

14

WIS. STAT. § 908.03(8). Here, the state agency at issue is DHS, which is required to "operate a secure mental health facility for the detention, evaluation and institutional care of persons under ch. 980." WIS. STAT. § 46.055. Sand Ridge, where Morrow is a patient, is operated as a result of that requirement. *City of Madison v. DHS*, 2017 WI App 25, ¶16, 375 Wis. 2d 203, 895 N.W.2d 844. DHS has a statutory obligation to "appoint an examiner to conduct a reexamination of the person's mental condition" within twelve months of the initial commitment and at least every twelve months after that "to determine whether the person has made sufficient progress for the court to consider whether the person should be placed on supervised release or discharged." WIS. STAT. § 908.07(1). As part of that reexamination, the "treating professional shall prepare a treatment progress report. The treating professional shall provide a copy of the treatment progress report" to DHS. § 908.07(4). The report shall include:

> (a) The specific factors associated with the person's risk for committing another sexually violent offense.
>
> (b) Whether the person is making significant progress in treatment or has refused treatment.
>
> (c) The ongoing treatment needs of the person.
>
> (d) Any specialized needs or conditions associated with the person that must be considered in future treatment planning.

Sec. 908.07(4). The treatment progress notes relate regularly-recorded, dated, first-hand accounts on Morrow's behavior, both positive and negative, by staff members and his individual treatment provider, Tripp.

¶32 The State argues that the treatment progress notes fall under the public records exception because they were made by DHS staff observing Morrow pursuant to the duty imposed by WIS. STAT. § 908.07, satisfying WIS. STAT.

§ 908.03(8)(b). Further, ch. 980 is a civil commitment, which means that if the records are used to establish factual findings during an investigation, the records would also satisfy § 908.03(8)(c).[15] Additionally, the treatment of custodianship of public records differs from § 908.03(6) and (6m). Any competent witness, which Dr. Merrick would undoubtedly qualify as, may provide the identification of the records and establish the required foundation. *See Keith*, 216 Wis. 2d at 77. Further, all of the declarants within the treatment progress notes are part of DHS, a required rule in assessing this exception. *See State v. Gilles*, 173 Wis. 2d 101, 113-14, 496 N.W.2d 133 (Ct. App. 1992) (concluding that a proponent of a hearsay exception under § 908.03(8) would need to qualify the statement of a non-employee of the organization under a different exception for the statement to be admissible). Finally, Morrow has not alleged that the treatment progress notes "indicate [a] lack of trustworthiness." *See* § 908.03(8).[16] We conclude that the treatment progress notes in exhibits thirteen through twenty-six satisfy the requirements of this exception.

¶33 Additionally, Morrow objects to double hearsay in the form of a comment attributed to a social worker in 2003 in the psychiatric assessment completed by Dr. Espinoza in exhibit fourteen, dated June 2019. Morrow objects

---

[15] We consider the treatment progress reports produced by DHS for ch 980 commitment to fall into the definition of public records for the same reasoning applied to "[p]robation and parole files compiled by the DOC [that] fall within the definition of public records," under WIS. STAT. § 908.03(8). *State v. Keith*, 216 Wis. 2d 61, 77, 573 N.W.2d 888 (Ct. App. 1997). Both types of records involve persons supervised by a state agency, contain regular updates on a person's conduct, and occur in civil proceedings after criminal judgments. *See id.*

[16] The trustworthiness inquiry is the "primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements of the report." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988) (discussing the substantially identical provision in the Federal Rules of Evidence, Rule 803(8)).

to the social worker's reference to a suicide attempt in 1990, before Morrow was a patient at Sand Ridge or even under ch. 980 commitment. As noted above, while Dr. Espinoza's report would most likely satisfy WIS. STAT. § 908.03(4) for medical diagnosis or treatment, and the social worker's general comments would fall under the public records exception under § 908.03(8), the hearsay within her comment most likely would be inadmissible.[17] "To be admissible, each prong of a double hearsay statement must conform with an individual exception to the hearsay rule." *Huntington*, 216 Wis. 2d at 691-92; WIS. STAT. § 908.05. Therefore, without an exception to hearsay, the reference to the 1990 suicide attempt was admitted in error. "Furthermore, if evidence has been erroneously admitted or excluded, we will independently determine whether that error was harmless or prejudicial." *Keith*, 216 Wis. 2d at 69.

¶34 We conclude that the erroneous admission of the double hearsay statement was harmless error because the record does not reflect that the 1990 suicide attempt was a substantial basis for the court's decision. The record reflects that the circuit court heard evidence to support its findings that the State proved that Morrow was more likely than not to commit an act of sexual violence in the future. That evidence included Morrow's lack of significant progress in his treatment, his ongoing struggles to manage his mental disorders, his troublesome conduct at Sand Ridge toward staff and other patients, and his own statements that he did not feel ready to leave Sand Ridge. It is clear beyond a reasonable doubt that any error in the admission of this double hearsay did not affect the outcome of

---

[17] The social worker's reference to the 1990 suicide attempt did not identify the reporter of the information. Because this incident predates Morrow's placement at Sand Ridge by about eleven years, by inference, the social worker could not have personal knowledge of the incident. Therefore, we analyze it under the concern for double hearsay. *See* WIS. STAT. § 908.05.

the trial. *See State v. Nelson*, 2014 WI 70, ¶44, 355 Wis. 2d 722, 849 N.W.2d 317.

¶35 Ultimately, we conclude that the fourteen exhibits of objected-to treatment progress notes were admissible as public records under the WIS. STAT. § 908.03(8) hearsay exception. Although the State argues this was the basis by which the circuit court admitted the evidence, our examination of the record does not show which exception the court applied. It referenced a medical diagnosis at one point, but it did not make a specific ruling. As we concluded in *Keith*, "[w]e need not resolve this dispute over the circuit court's ground for admission because we may affirm the admission of evidence so long as there is a proper basis for it in the law." *Id.*, 216 Wis. 2d at 76. Moreover, "[i]f we can discern a reasonable basis for its evidentiary decision, then the circuit court has not committed an erroneous exercise of discretion." *Huntington*, 216 Wis. 2d at 681. Therefore, we conclude the circuit court's admission of the treatment progress reports in exhibits thirteen through twenty-six was not an erroneous exercise of discretion.

## CONCLUSION

¶36 For the reasons stated above, we conclude that the circuit court's exercise of discretion admitting the treatment progress notes was not erroneous.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(b)(5).